# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00252-SCT

*JAMES KENNETH HENSARLING*

*v.*

*BRENDA ROXANNE GRAY HENSARLING*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/5/1999 |
| TRIAL JUDGE: | HON. WILLIAM HALE SINGLETARY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JANICE T. JACKSON |
| | JOHN R. McNEAL, JR |
| ATTORNEYS FOR APPELLEE: | WILLIAM D. KETNER |
| | W. DAVID ROSS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 06/20/2002 |
| MOTION FOR REHEARING FILED: | 7/8/2002; denied and Opinion modified at Paragraph 25 9/5/2002 |
| MANDATE ISSUED: | 9/12/2002 |

### CONSOLIDATED WITH

### NO. 2000-CA-00333-SCT

DATE OF JUDGMENT:          2/24/2000

TRIAL JUDGE:               HON. WILLIAM HALE SINGLETARY

COURT FROM WHICH           HINDS COUNTY CHANCERY COURT
APPEALED:

ATTORNEYS FOR              JANICE T. JACKSON
APPELLANT:
                           JOHN R. McNEAL, JR.

ATTORNEYS FOR APPELLEE:    WILLIAM D. KETNER

                           W. DAVID ROSS

NATURE OF THE CASE:        CIVIL - DOMESTIC RELATIONS

DISPOSITION:               AFFIRMED IN PART; REVERSED AND REMANDED IN PART
                           - 06/20/2002

MOTION FOR REHEARING
FILED:

MANDATE ISSUED:

**EN BANC.**

**GRAVES, JUSTICE, FOR THE COURT:**

¶1. On December 7, 1995, James Kenneth Hensarling ("Ken") initiated divorce proceedings against his wife, Brenda Roxanne Gray Hensarling ("Brenda"), by filing a Complaint for Divorce in the Chancery Court of Hinds County. In the Final Judgment of Divorce dated November 5, 1999, the chancellor awarded Ken a divorce on the grounds of adultery. Among other things, Brenda was given custody of the parties' three children, $2,500.00 per month in child support, rehabilitative alimony in the amount of $1,500.00 per month for six years, 35% of the marital estate and attorney fees. On appeal, both Ken and Brenda allege error. Ken maintains that the chancellor erred by giving custody of the children to their mother; awarding child support without specific findings of fact; conveying 35% of the marital estate to Brenda; granting attorney fees to Brenda; allowing Brenda relief pursuant to the court's motion sua sponte; and failing to grant a new trial, amend the Final Judgment or set it aside. Brenda, in her cross-appeal, contends that Ken should not have been granted a divorce on the grounds of adultery; rather, she should have been awarded a divorce on the basis of habitual cruel and inhuman treatment. She also alleges that the chancery court undervalued the marital estate and that the chancellor erred in limiting her share to 35%.

¶2. We find that the chancellor erred with regard to the valuation of the marital estate and the interest awarded and that the record does not justify the amount of the award of attorney's fees to Brenda. We therefore affirm in part and reverse and remand in part.

<u>FACTS AND PROCEEDINGS BELOW</u>

¶3. Ken and Brenda were married on July 20, 1974. When they met, Brenda was working at the V.A. Medical Center in Jackson and taking night classes at Hinds Community College, while Ken was a fourth

year medical student.[1] Brenda thinks she worked full-time for five of the first seven years of their marriage. She quit work prior to the conception of Lauren and went back to the V.A. on a part-time basis for two years, at most, after Lauren was born. Following medical school, Ken completed a residency during which he moonlighted for extra money. The couple pooled their incomes while they were both working and when Brenda stopped working, Ken supported the family.

¶4. They were married for twenty-one years, during which time three children were born: Lauren (d/o/b Aug. 26, 1982), Gray (d/o/b Oct. 14, 1989) and Kate (d/o/b Nov. 9, 1990). Brenda claims that after some early difficulties prior to the birth of the children, there was no major marital discord until the summer of 1995. In July of that year, Ken announced that he wanted a divorce.

¶5. Ken filed for divorce on December 7, 1995. The grounds for divorce were changed from irreconcilable differences to adultery, habitual cruelty and constructive desertion in the amended complaint. An agreed temporary order regulating temporary custody, visitation, alimony, child support, insurance, mortgage payments, etc. was entered in May of 1996. Brenda counterclaimed for divorce based on habitual cruel and inhuman treatment on April 17, 1997.

¶6. Beginning in 1997, litigation of this case took nineteen (19) days over a period of about two and a half years. The chancellor, in his first opinion, declined to grant the parties a divorce. At this point, Brenda amended her counterclaim for divorce to include constructive desertion as grounds for divorce. On October 5, 1999, the chancellor amended his original opinion and awarded Ken a divorce on the grounds of adultery. The next day, in a third opinion entitled "Order on Motion Sua Sponte To Reconsider The Court's Ruling And Opinion Dated October 5, 1999, And Amending Said Opinion," the chancellor made some changes in the valuation of the marital estate and ordered that Brenda was to receive 35% of these additional assets plus any interest thereon from the date of the order. After his Motion For A New Trial Or Amendment Of Judgment was denied, a notice of appeal was timely filed by Ken on February 25, 2000. Brenda filed her cross-appeal the same day. Thereafter, Ken filed an amended notice of appeal on March 16, 2000.

## STANDARD OF REVIEW

¶7. In domestic relations cases the scope of review is limited by the substantial evidence/manifest error rule. *Magee v. Magee,* 661 So.2d 1117, 1122 (Miss.1995). This Court may reverse a chancellor's finding of fact only when there is no "substantial credible evidence in the record" to justify his finding. *Henderson v. Henderson*, 757 So.2d 285, 289 (Miss. 2000). "Our scope of review in domestic relations matters is limited under the familiar rule that this Court will not disturb a chancellor's findings unless manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard." *Johnson v. Johnson,* 650 So.2d 1281, 1285 (Miss.1994) (citing *McEwen v. McEwen,* 631 So.2d 821, 823 (Miss.1994)).

## DISCUSSION

**I. Whether the chancellor misapplied the law and committed manifest error in (1) finding against the substantial weight of the evidence in awarding custody to Defendant; (2) finding the court-appointed guardian ad litem did not have the skills necessary to draw conclusions about custody; and (3) striking the testimony given by the court-appointed therapist from May 13, 1998 and forward.**

¶8. We may not always agree with a chancellor's decision as to whether the best interests of a child have been met, especially when we must review that decision by reading volumes of documents rather than through personal interaction with the parties before us. However, in custody cases, we are bound by the limits of our standard of review and may reverse only when the decision of the trial court was manifestly wrong or clearly erroneous, or an erroneous legal standard was employed. *Wright v. Stanley*, 700 So.2d 274, 280 (Miss. 1997); *Williams v. Williams*, 656 So. 2d 325, 330 (Miss. 1995). Our standard of review in child custody cases is very narrow. Like the chancellor, our polestar consideration must be the best interest of the child. However, it is not our role to substitute our judgment for his.

¶9. In his opinions of November 18, 1998, and October 5, 1999, the chancellor, using the factors listed in *Albright v. Albright,* 437 So.2d 1003 (Miss. 1994), made an on-the-record finding as to which parent should have custody of the parties' two minor children.[2] (R. 399-402; 560-62). Although the chancellor did not separately discuss each *Albright* factor, he gave his rationale along with his holding as to the five factors which were found to favor Brenda.[3] Of the remaining six factors, five are neutral or evenly divided between Brenda and Ken[4]; the sixth, preference of the children, is not applicable due to the ages of the children involved in this case. We find that the chancellor properly applied the *Albright* factors and find no manifest error in his decision as to custody of the parties' children.

¶10. Ken also maintains that the chancellor erred in determining that the court-appointed guardian ad litem ("GAL"), Melissa Gardner, did not have the skills necessary to draw conclusions about custody. The GAL was specifically appointed by the court to determine what would be in the best interest of the children. She recommended that Ken be given custody of the two minor children, and the chancellor rejected her suggestion. The chancellor was in no way bound to follow the recommendation made by the GAL. *See S.N.C. v. J.R.D.,* 755 So.2d 1077 (Miss.2000) (we held that the "view of the guardian [ad litem] and the reasoning behind that view are nothing more than additional information to aid the chancellor in making the decision on the merits of the matter in dispute, which ultimately lies with the chancellor . . ."). Instead, it is his role, as fact-finder, to consider the evidence presented by the GAL as well as all other relevant evidence and to give it such weight as he determines it deserves. *Id.* The chancellor did not say that he found the GAL's findings irrelevant, just that he placed "greater weight" upon the conclusions of the other experts. We find no error in the decision of the trial court as to the testimony of the GAL.

¶11. Ken argues that the chancellor erred when he struck the testimony of the court- appointed therapist from the record. Paul Davey ("Davey") was designated, pursuant to M.R.E. Rule 706, as a court-appointed therapist on May 8, 1997, and continued to have contact with the Hensarling children until June 2, 1999. During this time, he evaluated the home environments of the parties' and the mental/emotional health of the parties and their children. At the end of his investigation, Davey made a report to the chancellor recommending that Ken be granted custody of the children.

¶12. Brenda avers that Davey completed his court-appointed assignment on May 13, 1998, after which time he became a privately retained therapist, paid by Ken. If this is true, then any disclosures made to Davey after May 13, 1998, are protected by the doctor-patient privilege set out in M.R.E. 503. Brenda made a motion to strike any information of which Davey learned after May 13, 1998, and the court granted this motion. Based on M.R.E. 503, we find that such information was properly omitted from the record.

## II. Whether the chancellor erred in the amount of child support awarded without specific findings of fact.

¶13. Ken alleges that the chancellor failed to apply the statutory guideline set out in Miss. Code Ann. § 43-19-101 (2000) when he determined the amount of child support owed. The award of $2,500 per month; plus insurance including all non-covered medical and dental expenses; private school tuition and all fees associated therewith; and college tuition, room and board is greater than 22% of Ken's estimated salary.[5] However, Miss. Code Ann. § 43-19-101(2) states that the guidelines

> apply unless the judicial or administrative body awarding or modifying the child support award makes a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined under the criteria specified in Section 43-19-103.

¶14. In his orders dated November 18, 1998, and October 5, 1999, the chancellor found that special circumstances so exist which would "necessitate a variance from the statutory guidelines in setting Ken's obligation of child support." He noted that as a doctor, Ken has the ability to earn a substantial income, whereas at this time, Brenda has no source of income other than the rehabilitative alimony she will receive for a few years. Also, the children have special needs which he deemed to include private school tuition, as the children's friends and "daily routines and activities" stem from them attending private school. We find that these reasons meet the criteria set out in Miss. Code Ann. § 43-19-103(f) & (h). *See Vaughn v. Vaughn,* 798 So.2d 431 (Miss. 2001) (where findings were sufficient when the chancellor explained the source of the husband's income, noted that the income was expected to continue, and found that the resulting child support award was necessary and reasonable to maintain a reasonable standard of living for the child).

¶15. We also note that Ken has substantial savings and other income producing assets. Additionally, Ken's income is likely to increase as his career gets back on track. In light of this, we point to our holding in *Thurman v. Thurman,* 559 So.2d 1014 (Miss. 1990), in which we held that the statutory guidelines regarding child support are not absolute, and the actual circumstances in each case are to be taken into consideration by the chancellor when making his award. *Johnston v. Johnston,* 722 So.2d 453 (Miss. 1998), is also relevant. There we found that where the husband can claim the child as a dependent on his income taxes, then an amount of child support in excess of the statutory guideline is justified. *Id.* at 462. Ken is allowed to claim all three children as dependents for tax purposes. Lastly, over the years Ken and Brenda established college funds for the children. The accounts totaled upwards of $168,000 as of October 1995. We find that this should have been taken into consideration since, depending on where the children go to college, Ken's out-of-pocket expenses could be minimal. For these reasons, we find no error with the chancellor's decision regarding child support.

> **III. Whether the chancellor erred in his determination of the value of the marital estate and in finding that Brenda was entitled to 35% of the marital estate, including interest from the date of separation to the date of the Final Judgment.**

> **VIII. Whether the chancellor undervalued the marital estate and/or erred in limiting Brenda's share to 35%.**

¶16. Ken says that mathematical impossibility and manifest error keep the chancellor's determination of the value of the marital estate from being proper. Ken also alleges that the trial court failed to apply the guidelines set out in *Hemsley* (determination of marital assets) and *Ferguson v. Ferguson,* 639 So.2d 921 (Miss. 1994) (equitable distribution of marital assets). Under the circumstances, we find that the chancellor ruled correctly despite Ken's attempts to hide substantial portions of his assets and despite the

amount of assets disposed of by both parties while this case was being litigated. In his amended opinion, the chancellor found that the marital estate consisted of $826,944.00 held in several brokerage accounts and IRA's. In his Order on Motion Sua Sponte, the chancellor amended his prior decision to include two (2) retirement accounts, an IRA and a profit-sharing account. The chancellor said that these portions of the marital estate had been inadvertently omitted from the marital estate in his previous opinion.

¶17. Ken contends that five checks totaling $40,565.89, which he acquired almost a year before he filed for divorce, should not be considered part of the marital estate as the chancellor did not make any findings as to these specific funds. The court noted, however, that both Ken and Brenda stipulated in their testimony that they had no assets when they were first married. Following this logic, through Ken's own admission, all that they acquired during the marriage is a marital asset. We hereby uphold the chancellor's finding that these five checks are part of the marital estate.

¶18. Brenda, too, alleges error in the chancellor's valuation of the marital estate. Namely, she contends that since Ken's medical practice was found to have been undervalued by $55,326.50 and, since a remittitur of said amount was tendered,[6] the total value of the marital assets should have been increased to reflect the error in the valuation of the medical practice. Brenda also claims the $110,000.00 in cash and the 25 gold Krugerands Ken hid in a closet in his parent's home should be included in the marital estate as Ken liquidated accounts containing funds acquired during the marriage to obtain the cash and the gold.

¶19. We agree with Brenda. The chancellor properly found the medical practice was a marital asset,[7] and the mistake in its valuation was brought to his attention. As for the money and the Krugerands, Ken never argues that these specific items should not be considered as part of the marital estate. In his brief, Ken places a lot of weight on the fact that Brenda was not much of a cook, that Brenda made false accusations about him, and that Brenda had an adulterous relationship with Art Sharpe. However, none of these things are relevant in determining marital assets. All evidence points to the fact that the items at issue were acquired with marital funds, and as such are to be included as assets for the purpose of equitable distribution.

¶20. Equitable distribution does not always mean an **equal division** of property. Mississippi is not a community property state. *Chamblee v. Chamblee,* 637 So.2d 850, 863-64 (Miss. 1994); *Dillon v. Dillon,* 498 So.2d 328, 330 (Miss.1986); *Rives v. Rives,* 416 So.2d 653, 657 (Miss.1982). The community property system and Mississippi's system of equitable division are very dissimilar. In a community property state, the court may not look at the background of the marriage and/or the behavior of the married couple to decide what would constitute a just distribution of property. Instead the law in a community property state mandates an even division of all marital property, regardless of each parties' respective contributions.

¶21. Under the system of equitable distribution, the courts in Mississippi are not so inhibited. "The matter rather is committed to the discretion and conscience of the Court, having in mind all of the equities and other relevant facts and circumstances." *Chamblee,* 637 So.2d at 864 (citing *Brown v. Brown,* 574 So.2d 688, 691 (Miss.1990)). This Court's holdings in the aforementioned cases show that the chancellor's discretion in the area of equitable distribution is exceedingly broad and he "has the flexibility to do what equity and justice requires." *Chamblee,* 637 So.2d at 864. The chancery court is authorized to call for an equitable division of jointly accumulated property and in doing so to look behind the formal state of title. *See, e.g., Jones v. Jones,* 532 So.2d 574, 579-81 (Miss.1988); *Regan v. Regan,* 507 So.2d 54, 56 (Miss.1987);

*Watts v. Watts,* 466 So.2d 889, 890-91 (Miss.1985). *Ferguson v. Ferguson,* 639 So.2d 921, set forth the factors to be weighed in determining an equitable division of marital property.[8]

¶22. A main consideration in a proper division of property is the economic contributions made by each party to the marriage, both in terms of actual money earned and in terms of service without compensation, i.e., domestic duties. *Regan,* 507 So.2d at 56; *Pickle v. Pickle,* 476 So.2d 32, 34 (Miss.1985). The case at bar features a couple who have each, over their twenty plus years of marriage, contributed money and/or non-compensated time to the marriage. Admittedly, Ken contributed the most monetarily, but it is also apparent, though disputed, that both parties contributed various amounts of non-paid services such as child care and domestic work to the marriage.

¶23. In his opinion, the chancellor properly considered the *Ferguson* factors in making an equitable distribution of the parties' assets. He found that based on the information before him, Ken was due a majority of the parties' assets. A 50/50 split of the parties' assets is not necessarily warranted, but equitable distribution does require "fundamental fairness" in the division of marital assets. *See Savelle v. Savelle,* 650 So.2d 476, 479 (Miss. 1995). Factors in Brenda's favor include her contributions to the family during the twenty-one year marriage and her willingness to give up college and work outside of the home in order to care for the couple's children, which resulted in her being financially dependent upon Ken and having a minimal earning capacity compared to his. However, the chancellor did not include as marital assets the marital home and its contents or the Mercedes, all of which were awarded to Brenda. Additionally Brenda was awarded $108,000 in alimony. We have held that property division, alimony and child support should be considered together when determining equitable distribution. *Ferguson,* 639 So.2d at 929. "Therefore, where one expands, the other must recede." *Id.* (citing *LaRue v. LaRue,* 304 S.E.2d 312, 334 (W.Va. 1983)). Giving due consideration to all of the awards to Brenda and also her extramarital affair, the chancellor's equitable distribution of the marital assets was proper.

¶24. We now turn to the issue of the award of interest accrued from the date of separation to the date of the Final Judgment. In *Godwin v. Godwin,* 758 So.2d 384 (Miss. 1999), we held that assets acquired after an order for separate maintenance should be considered the separate property of the parties, and can not be divided absent a showing of either (1) contribution to the acquisition of the asset by the other spouse, *Magee v. Magee*, 661 So.2d 1117, 1123 (Miss.1995), *Ferguson*, 639 So.2d at 928-29 or, (2) acquisition of the asset through the use of marital property.

¶25. Ken admits that the A.G. Edwards accounts in question were started with funds from accounts existing prior to the time of separation, thus making them marital assets. Therefore, Brenda is entitled to part of the money in these accounts. The chancellor, in his previous orders, used the date of separation as the date of valuation, and we have held that "[w]hen equitably dividing marital property upon divorce, the date of valuation is necessarily within the discretion of the chancellor." *MacDonald v. MacDonald,* 698 So.2d 1079, 1086 (Miss. 1997). It follows that any portion of the A.G. Edwards accounts which were or should have been included as marital assets at the date of separation are properly found to be marital property. We find that the interest accrued from the date of separation to the date of the Final Judgment should be awarded only as to that portion of the funds which were originally marital assets. If Ken has added any money to either of these accounts since the date of separation, this amount will be considered separate property and any interest accrued on it will be the sole property of Ken unless the money added to the accounts has already been classified as marital property. We hold that this issue should be remanded in order to determine the exact total of the marital funds used to set up the account and the amount of

additional funds, if any, contributed after the date of separation.

### IV. Whether the chancellor erred in his award of attorney fees to Brenda.

¶26. "Though the general rule in Mississippi is that if a party is financially able to pay his attorney's fees he should do so, this is a matter which is entrusted to the chancellor's sound discretion." ***Pittman v. Pittman,*** 652 So.2d 1105, 1112 (Miss. 1995). *See also* ***Hankins v. Hankins,*** 729 So.2d 1283 (Miss. 1999) (we held that it is an abuse of discretion for a trial court to award costs and attorney's fees without a showing that the payee is unable to pay the fees at issue). In ***Pittman***, the husband, James, tried to convey the marital home to his sister and niece in an effort to hide an asset that would properly have been considered marital property and, as such, subject to equitable distribution. ***Id.*** The wife, Claudine, was forced to bring a separate suit in order to stop the proceedings regarding the transfer of the house. ***Id.*** The chancellor awarded Claudine $1,500.00 in legal fees after concluding that James's conduct in trying to convey the house to his sister and niece warranted the imposition of said fees. ***Id.*** Claudine was not rewarded by the chancellor's decision, but only reimbursed the extra legal costs incurred as a result of James' actions. ***Id.*** Even though Claudine did not prove her inability to pay her attorney's fees, we held that the chancellor was not manifestly wrong and that his decision to award attorney fees did not constitute error. ***Id.***

¶27. In the instant case, Brenda did not prove that she could not pay her attorney fees, nor did she have to bring a separate suit with regard to the marital assets. However, Ken's purposeful acts of hiding money and assets prolonged the litigation. Much time and effort was spent in attempting to locate the assets that Ken had hidden. The chancellor even had to halt litigation so the parties could travel out-of-town to secure assets which Ken admitted in his testimony that he had hidden. This should not have occurred, as Ken's responses to discovery and interrogatories should have disclosed all of the assets. We held in ***Vicksburg Ref., Inc. v. Energy Resources Ltd.,*** 512 So.2d 901 (Miss. 1987), that "[w]hen counsel's carelessness causes his opponent to expend time and money needlessly, it is not an abuse of discretion for the court to require offending counsel to pay for his mistake, especially where . . . out-of-town travel was involved." ***Id.*** at 902.

¶28. Ken states that he does not mind paying expenses associated with the trip to Petal, Mississippi, on November 12, 1997, to inventory the assets located there. He also says that he has no objection to paying attorney fees stemming from the same day as long as they relate to "discovering, preparing for and responding to [his] attempts to secret [sic] marital assets." However, Ken maintains that the itemization provided by Brenda's attorneys is not detailed enough for anyone to be able to discern whether the activities listed relate to the hidden marital assets. The itemization of fees earned in relation to Ken's attempt to hide assets from Brenda including the affidavit of Jerry L. Mills is listed as Appeal Exhibit 112 and though lengthy, it does not appear to be accurate or complete. For example, the very first entry in Exhibit "A" reads as follows, "Receive and Review Hensarlings [sic] Motion to Modify Amount of Maintenance." It is not logical that Ken should have to pay for this. Even if he had disclosed all of his assets to begin with, he could still have filed a Motion to Modify Amount of Maintenance; there is no way to prove that his actions would have been any different had all the assets been known from the start. Item 22, dated June 3, 1997, simply says "Subpoena issued." Who was subpoenaed? Why were they subpoenaed? A listing of time spent "determin[ing] whether assets accumulated during the marriage are still available and investigat[ion] [of] possible diversion of assets through the purchase and holding of cashiers [sic] checks," has no heading or signature. It is seemingly a copy of a bill to Brenda, but it is unclear who rendered these services. The exhibits accompanying Mills's affidavit are replete with similar errors.

¶29. We find the chancellor's award of $20,000 is arbitrary. A total of all of the expenses listed in Exhibit "A" comes to $30,909.07. The chancellor said only that the award was to reimburse Brenda for attorney fees related to Ken's missing 1997 W-2 and to partially reimburse her for the legal expense incurred through "discovery attempts and trial preparation following actual delivery of the requested information," and for the hearings on the motions for contempt filed against Ken. He did not specify how the award correlated to the expenses incurred by Brenda. As the original figure was arbitrary in nature, we cannot determine by how much the award should be reduced.

¶30. The chancellor stated in his amended opinion that the $20,000 he awarded Brenda was also to partially compensate her "for the expense of her attorney in prosecuting the various contempt motions[ .]" Ken argues that as an order was never issued holding him in contempt that it constitutes error for the judge to give Brenda expenses for motions which were never decided in her favor. As for the portion of the $20,000 which the chancellor awarded as a result of the motions for contempt brought by Brenda, we agree with Ken. Per our holding in ***Varner v. Varner,*** 666 So.2d 493 (Miss. 1995), the trial court must make a factual finding of contempt before attorney fees may be considered. ***Id.*** at 498. No order was ever entered on any of the motions for contempt, therefore, it was erroneous for the chancellor to award attorney fees based on the motions for contempt.

¶31. We hereby reverse and remand this issue to the trial court so that it can make an on the record finding as to the allocation of the award and a reduction of said award consistent with this opinion.

### V. Whether the chancellor erred in awarding the relief given in its motion sua sponte.

¶32. The chancellor in his Order On Motion Sua Sponte To Reconsider The Court's Ruling And Opinion Dated October 5, 1999, And Amending Said Opinion never once mentioned that said order was in response to a Motion for Contempt filed by Brenda. None of Brenda's motions for contempt mention the A.G. Edwards accounts. We find no link between the chancellor's motion sua sponte and Brenda's motion(s) for contempt other than unsubstantiated references in the parties' briefs. Therefore Ken's argument that the chancellor did not have jurisdiction is moot.

¶33. We have already held that these accounts were at least partially composed of funds acquired by the parties during the marriage, thereby making them marital assets. The chancellor entered this order for the purpose of rectifying "the inadvertent failure of the [c]ourt to include a certain asset in the marital estate." We find that the chancery court did not commit procedural error in this instance.

### VI. Whether the chancellor erred in failing to grant a new trial or, alternatively, to amend its judgment of November 5, 1999, or to set it aside.

¶34. Ken filed a Motion For New Trial Or In The Alternative To Reopen Or Set Aside Judgment on November 5, 1999. The chancellor heard and subsequently denied the motion on January 25, 2000. Ken argues that the weight of the evidence shows that the relief requested therein should have been granted. As we have previously held, the credible evidence must be construed in a manner most favorable to the non-moving party. ***Clark v. Columbus & Greenville Ry.,*** 473 So.2d 947, 950 (Miss.1985). We have stated:

> In the final analysis, it is only when the experienced [] judge, after examining all of the facts unique to each case 'is left with a firm and definite conviction that the verdict if allowed to stand would work a miscarriage of justice,' that the granting of a new trial on the weight of the evidence is justified.

*Samuels v. Mladineo,* 608 So.2d 1170, 1180 (Miss. 1992) (quoting *Anchor Coatings v. Marine Indus. Res. Insul.,* 490 So.2d 1210, 1215 (Miss.1986)).

¶35. As mentioned above, we find error in the portion of the $20,000 award to Brenda for attorney fees/sanctions and have directed that further findings be made as to the allotment of this award. We find no error in the ruling of the trial court which constitutes abuse of discretion such as would necessitate a new trial.

> **VII. Whether the chancellor erred in granting Ken a divorce on the grounds of adultery instead of granting Brenda a divorce on the grounds of habitual cruel and inhuman treatment.**

¶36. This issue lies within the discretion of the chancellor as the trier of fact and must be decided based on the weight and sufficiency of the evidence. The standard of proof in cases involving allegations of adultery as grounds for divorce was clearly and succinctly stated by this Court in *Holden v. Frasher-Holden,* 680 So.2d 795 (Miss. 1996). In that case we stated as follows:

> "A charge of adultery may be grounds for divorce upon a showing of either an infatuation for a particular person of the opposite sex or a generally adulterous nature on the part of the defendant." [*McAdory v. McAdory,* 608 So.2d 695, 700 (Miss. 1992).] There must be evidence of one or the other before a divorce may be granted on these grounds. *Id.* In [*Brooks v. Brooks,* 652 So.2d 1113, 1118 (Miss.1995)], this Court recited the proper evidentiary standard to be applied to the proof set forth by the complaining party, as articulated in [*Dillon v. Dillon,* 498 So.2d 328, 330 (Miss.1986)]:

> In Mississippi one seeking a divorce on the grounds of adulterous activity must show by clear and convincing evidence both an adulterous inclination and a reasonable opportunity to satisfy that inclination. *Owen v. Gerity,* 422 So.2d 284, 287 (Miss.1982); *Magee v. Magee,* 320 So.2d 779, 783 (Miss.1975); *Rodgers v. Rodgers,* 274 So.2d 671, 673 (Miss.1973). **Where the plaintiff relies on circumstantial evidence as proof for his allegations, he or she retains the burden of presenting satisfactory evidence sufficient to lead the trier of fact to a conclusion of guilt.** *Rodgers,* 274 So.2d at 673. However, such evidence need not prove the alleged acts beyond a reasonable doubt and **the plaintiff is not required to present direct testimony as to the events complained of due to their secretive nature.** Bunkley & Morse's Amis, *Divorce & Separation in Mississippi,* §§ 3.09(5)(1957). Nevertheless, the burden of proof is a heavy one in such cases because the evidence must be logical, tend to prove the facts charged, and be inconsistent with a reasonable theory of innocence. *Owen,* 422 So.2d at 287, citing and quoting *Banks v. Banks,* 118 Miss. 783, 79 So. 841 (Miss. 1918). *Brooks*, 652 So.2d at 1116 (quoting *Dillon*, 498 So.2d at 330) (emphasis added).

*Holden,* 680 So.2d at 798.

¶37. We also held in *McAdory* "that the elements of infatuation or proclivity toward adulterous behavior must be supported by evidence of a reasonable opportunity to satisfy the infatuation or proclivity." *McAdory,* 608 So.2d at 700. Brenda testified that she did not know Art Sharpe until after Ken had left home and filed for divorce and that she was never sexually involved with him. However, in this case there is substantial evidence in the record to support the chancellor's conclusion that proclivity and opportunity were

present in the relationship between Brenda and Art Sharpe. The burden of proof was met with regard to this issue. As such, the chancellor's finding of adultery is not clearly erroneous.

¶38. Finding that the trial court did not err in granting the parties' divorce on the grounds of adultery, there is no need to discuss the issue of habitual cruel and inhuman treatment.

## CONCLUSION

¶39. We find that the chancellor erred with regard to the valuation of the marital estate and accordingly as to the interest earned thereon. Also, the record does not justify the amount of the award of attorney's fees to Brenda. We therefore reverse the chancellor's valuation of the marital estate and remand this issue for the chancellor to recompute the value of the marital estate by increasing it to include the corrected valuation of Ken's medical practice, the $110,000.00 in cash, and the 25 gold Krugerands. We also reverse the chancellor's award of interest on the marital estate and remand for a new award based on a recalculation of that award to include interest accrued from the date of separation to the date of final judgment on only those funds in the A.G. Edwards accounts as of the date of separation. Finally, we reverse the award of attorney's fees to Brenda and remand to the chancellor for a new award of attorney's fees consistent with this opinion. In all other respects, we affirm the judgment below.

¶40. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**McRAE, P.J., DIAZ AND CARLSON, JJ., CONCUR.. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, P.J., EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. PITTMAN, C.J., AND WALLER, J., NOT PARTICIPATING.**

**COBB, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶41. Although I agree with most of the majority opinion, this separate opinion is written to address what I believe is manifest error on the part of the chancellor in his 65/35 division of the marital assets in favor of Ken Hensarling.

¶42. This was a 25 year marriage which began in 1974 when Brenda was only 19 years of age and Ken was a medical student. Three children were born of the union, the first during the seventh year of the marriage. Although both Ken and Brenda worked while he was in medical school, during most of the marriage Brenda was a homemaker, wife, and mother, and did not work outside the home.

¶43. The parties agreed, and the chancellor found, that everything they own is a part of the marital estate. From that point of beginning, the chancellor began his analysis which resulted in awarding Ken 65% and Brenda only 35% of the marital assets.

¶44. The *Ferguson* factors which govern equitable distribution have been set forth by this Court as follows:

> (1) substantial contributions to the accumulation of the property, including **economic and domestic** contributions by each party to the marriage, (2) expenditures and disposal of the marital assets by each party, (3) the market value and emotional value of the marital assets, (4) the value of the

nonmarital property, (5) tax, economic, contractual, and legal consequences of the distribution, (6) elimination of alimony and other future frictional contact between the parties, (7) the income and earning capacity of each party, and (8) any other relevant factor that should be considered in making an equitable distribution.

*Selman v. Selman*, 722 So. 2d 547, 552 (Miss. 1998). (emphasis added.)

¶45. The chancellor found that "Ken by far **earned the family's income** following medical school, when Brenda **worked as a homemaker**" and he "credit[ed] Brenda with **a greater contribution to the stability and nurturing of the family than Ken**" who spent most of his time at work. (Emphasis added.) The chancellor further found that both Ken and Brenda had behaved improperly in withdrawing and spending marital assets, but "Ken's conduct in hiding, manipulating, selling, giving away and outright wasting the marital estate over the past four years has **by far been the most egregious**" and that Brenda "clearly showed" that her liquidation of various assets "was necessary in order to keep a roof over the children's heads, food on the table and utilities in service." (Emphasis added.) In addition, the chancellor noted evidence that Ken himself had discouraged Brenda from working, and that her long absence from the workplace had handicapped her earning potential.

¶46. In summing up the analysis by which he arrived at what he determined to be an equitable distribution of the marital assets, the chancellor wrote that

> Brenda is not without her considerable shortcomings, having demonstrated a lack of sufficient interest in some of her family obligations, and **following the separation** having taken refuge in the arms of a man not her husband during the emotional turmoil of this proceeding. However, **the Court specifically finds that Brenda's contribution to the family through the twenty-five years of this marriage prior to the parties' separation, Ken's discouragement of interest she expressed in preparing herself to be productive outside the home and her resulting need for financial security, and her income earning capacity by comparison with his, entitles Brenda to a somewhat larger award in the division of marital assets than that to which she might otherwise be considered entitled based on her contributions to the actual accumulation of that estate**.

(emphasis added).

¶47. It is troubling that the "somewhat larger award . . . than that to which she might otherwise be entitled" inexplicably turned out to be only **one third** of the marital estate. The chancellor's statement, and his resulting 35/65 distribution, clearly implies that he is considering only (or primarily ) **economic** contributions as "contributions to the actual accumulation of that estate". This contradicts not only the letter, but also the spirit of equitable distribution in Mississippi.

¶48. Contributions to the accumulation of property are measured by **economic and domestic** contributions by each party to the marriage, according to *Ferguson*. 639 So. 2d at 928. "We assume for divorce purposes that the contributions and efforts of the marital partners, whether **economic, domestic, or otherwise**, are of **equal** value." *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994) (emphases added). The chancellor acknowledged that Brenda "worked as a homemaker" while Ken worked as a doctor, and this arrangement apparently met with Ken's approval. Thus, the chancellor's findings do not support so lopsided a distribution when domestic contributions are taken into account. Nor does it appear

that Ken's "egregious" behavior in the dissipation and concealing of marital assets carried much weight at all in the chancellor's award.

¶49. The majority appears to rationalize this clearly inequitable distribution by noting that "the chancellor did not include the marital home and its contents or the Mercedes, both of which were awarded to Brenda, as marital assets." However, the home carried only $34,000 in equity, and the Mercedes was only one of two luxury cars owned by the couple, the other of which went to Ken, who also received clear title to the estate's condominium. Brenda was also charged $20,000 against her share for the home's contents, so they cannot be said to increase her share so substantially as to make up for the two-to-one split.

¶50. Brenda's post-separation affair also is weighed by the majority as justifying the 65/35 split. This Court has held that, with regard to equitable distribution, "marital misconduct is a viable factor entitled to be given weight by the chancellor **when the misconduct places a burden on the stability and harmony of the marital and family relationship**,"*Carrow v. Carrow*, 642 So. 2d 901, 904-05 (Miss. 1994) (emphasis added). A punitive approach, by contrast, is explicitly disfavored. *Chamblee v. Chamblee*, 637 So. 2d 850, 863 (Miss. 1994). The chancellor noted that Brenda's adulterous conduct occurred after Ken left the marital home and filed for divorce, so the marital and family relationship was obviously already unstable and inharmonious when Brenda strayed. Moreover, Ken's behavior in mistreating their eldest child and in becoming seriously addicted to narcotics undoubtedly put a great deal of strain on the marriage, as much as or perhaps more than did Brenda's post-separation infidelity. To single out the adultery as more infamous than Ken's conduct, in the absence of specific findings clearly supporting such a claim, displays unacceptable bias.

¶51. Certainly, Mississippi is not a community property state, and there is no rule entitling a spouse to an automatic 50% of the marital estate. *Chamblee*, 637 So. 2d at 864. This Court has stated that the flaw of the community property rule is that it does not permit "a **fair** division of property." *Id.* (emphasis added). By contrast, our system of equitable distribution allows the chancellor to divide the estate "having in mind all of the equities and other relevant facts and circumstances." *Id.* (quoting *Brown v. Brown*, 574 So. 2d 688, 691 (Miss. 1990)). Therefore, while it is true that an equitable distribution need not be equal, it also appears true that deviations from equality are to be made with "all of the equities and other relevant facts and circumstances" in mind. Our system is not intended to allow chancellors to simply cite "equity" in general. In the present case, it has been shown that the chancellor apparently reached his two-to-one decision in favor of Ken primarily on Ken's greater economic contribution and on Brenda's post-separation affair. The former should not affect the distribution in view of Brenda's superior contributions to the home. And for the latter to justify such a disproportionate award is clearly punitive and unacceptable.

¶52. The majority concludes that the $108,000 in alimony awarded to Brenda serves to render the chancellor's distribution of the marital property equitable, based on the oft-cited language of *Ferguson*: "Where one expands, the other must recede." 639 So. 2d at 929. I respectfully disagree with this analysis. Our precedent is clear that equitable distribution precedes the determination of alimony, which is to be awarded only where necessary:

> Division of marital assets is now governed under the law as stated in *Hemsley* and *Ferguson*. **First**, the character of the parties' assets, i.e., marital or nonmarital, must be determined pursuant to *Hemsley*. The marital property is **then equitably divided**, employing the *Ferguson* factors as guidelines, in light of each parties' nonmarital property. **If** there are sufficient marital assets which,

when equitably divided and considered with each spouse's nonmarital assets, will adequately provide for both parties, **no more need be done**. **If** the situation is such that an equitable division of marital property, considered with each party's nonmarital assets, leaves a deficit for one party, **then** alimony based on the value of nonmarital assets should be considered.

*Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994) (emphases added). The language of this Court could not be clearer: *first* classify the assets, *then* divide the marital ones **equitably**, and *then*--**if necessary**--award alimony. It is this which the chancellor in the present case has failed to do. This sequence was first established in *Ferguson*, and has been respectfully quoted many times thereafter by this Court in "advance-and-recede" situations.

¶53. Alimony is meant to preserve the equities where an equitable distribution alone will not suffice, not to restore the equities to an inequitable distribution. An important result of the equitable distribution system should be the elimination or reduction of alimony.

¶54. That said, even taking into account the $108,000 rehabilitative alimony (payable to Brenda in 72 monthly payments of $1,500 each, which is approximately the amount of the monthly house payment on the marital home which Brenda now must pay), the distribution remains inequitable. As discussed above, there appears to be no valid and equitable reason for Brenda to receive substantially less than Ken. For every fault and deficiency alleged in Brenda, the chancellor noted something equally negative in Ken's behavior. Nevertheless, Ken was awarded $826,944 while Brenda was left with only $445,278. Adding $108,000 to Brenda's award, still leaves a ratio of 7:5. Such a ratio certainly might be justifiable in equitable distribution, but it has not been **justified** by the chancellor's opinion as it now stands, given that Brenda's domestic contribution to the marriage was not evidently inferior to Ken's economic contributions, and that neither party's moral behavior clearly fell beneath the other's.

¶55. I therefore respectfully dissent from the majority opinion and would reverse and remand this case to the chancellor with directions to make new findings and to equitably divide the estate (with alimony awarded if necessary) in accordance with the precedents set by this Court.

**SMITH, P.J., JOINS THIS OPINION.**

1. Brenda eventually acquired enough college credits to be classified as a junior.

2. Ken did not seek custody of Lauren.

3. The chancellor found the following factors to be in Brenda's favor: continuity of care; best parenting skills; employment & demands thereof; emotional ties between parent & child; and home, school, community record of child.

4. The chancellor found the following factors to be equal as to whether they benefit Brenda or Ken: age, health, sex of child; willingness & capacity of parent to provide care; physical/mental health & age of parents; moral fitness of each parent; and the stability of each parent's home.

5. Expert testimony by Kenneth Lefoldt, Jr., showed that Ken's income for 1998 would be at least $161,588. Ken's 1997 W-2 listed an income of $451,817.50.

6. *See **In re Dissolution of Jackson Arthritis Clinic & Osteoporosis Ctr., P.A.,*** 755 So.2d 418, 422

(Miss. 2000).

7. *Id.*

8. The *Ferguson* guidelines are set forth as follows: (1) Substantial contribution to the accumulation of the property which includes: (a) Direct or indirect economic contribution to the acquisition of the property; (b) Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and th e duration of the marriage; (c) Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets; (2) The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise; (3) The market value and the emotional value of the assets subject to distribution; (4) The value of assets not ordinarily, absent equitable factors to the contrary subject to distribution, such as property bought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse; (5) Tax and other economic consequences to third parties, of the proposed distribution; (6) The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties; (7) The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and (8) Any other factor which in equity should be considered. *Id.* at 934.