CARLTON, J.,
for the court.
¶ 1. The Lamar County Chancery Court granted Dr. Cecil Byron Smith and Aurora Miceli Smith’s joint request for a divorce, based on irreconcilable differences. The chancellor divided the mai'ital property and awarded Ms. Smith primary physical custody of the Smiths’ only child, child support, periodic alimony, rehabilitative alimony, and a division of the marital property. Additionally, the chancellor awarded Ms. Smith half of her attorney’s fees. Dr. Smith appeals and claims that the chancellor erred in (1) determining the amount of child support, (2) awarding rehabilitative alimony, (3) failing to accept a more recent valuation of the marital home, (4) failing to consider the fact that Dr. Smith was responsible for all marital debt, and (5) awarding attorney’s fees to Ms. Smith. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. The Smiths were married on April 3, 1991. Dr. Smith, an ophthalmologist, initially worked as an adjunct professor at the University of Kansas Medical School and operated a private ophthalmology practice in Kansas City, Missouri. When the couple first married, Ms. Smith worked as a surgical nurse. However, she stopped working soon after the marriage. They later had a son and their only child, Coleman. In 1998, the Smiths moved to Hattiesburg, Mississippi where Dr. Smith began practicing at the Southern Eye Clinic.
¶ 3. The Smiths’ marriage deteriorated, and they separated in late 2004. The Smiths attempted to reconcile, but they were unsuccessful. In July 2006, Ms. Smith filed for divorce. Slightly less than one year later, the chancellor granted the Smiths’ joint motion for a divorce based on irreconcilable differences.
¶ 4. Dr. and Ms. Smith agreed that Ms. Smith would have primary physical custody of Coleman, but they requested that the chancellor resolve the following issues: (1) equitable distribution of the marital assets, (2) whether Dr. Smith would pay Ms. Smith alimony, (3) the amount of child support Dr. Smith would be obligated to pay Ms. Smith, (4) whether the Smiths would share joint legal custody of Coleman and Dr. Smith’s visitation with Coleman, (5) division of certain personal property, and (6) whether Dr. Smith would be required to pay any of Ms. Smith’s attorney’s fees associated with the divorce.
¶ 5. Among other things, the chancellor ultimately: (1) granted Dr. Smith and Ms. Smith joint legal custody of Coleman, (2) set out Dr. Smith’s visitation schedule with Coleman, (3) ordered Dr. Smith to pay Ms. Smith $2,717.14 per month in child support, (4) divided the marital assets and liabilities, (5) ordered Dr. Smith to pay Ms. Smith $2,000 per month in periodic alimony, (6) ordered Dr. Smith to pay Ms. Smith $500 per month in rehabilitative alimony, and (7) ordered Dr. Smith to pay one-half of Ms. Smith’s attorney’s fees. Aggrieved by certain portions of the chan *372 cellor’s opinion that will be discussed in greater detail below, Dr. Smith appeals.
ANALYSIS
¶ 6. Our review of domestic relations matters is governed by the substantial evidence/manifest error rule. R.K. v. J.K., 946 So.2d 764, 772(¶ 17) (Miss.2007). This Court will not overturn the chancellor’s decision unless the chancellor was manifestly wrong or clearly erroneous. Id. Additionally, we will reverse the chancellor if he applied an erroneous legal standard. Id.
¶ 7. The supreme court has made it clear that the “scope of review in domestic relations matters is limited.... ” Johnson v. Johnson, 650 So.2d 1281, 1285 (Miss.1994). Additionally, we have found that “[w]hen-ever a chancellor’s decision is based on credible evidence, this Court will affirm that decision.” C.A.M.F. v. J.B.M., 972 So.2d 656, 666-67(44) (Miss.Ct.App.2007) (citations omitted). “Or differently stated, this Court may reverse a chancellor’s findings of fact only when there is ‘no substantial evidence in the record’ justifying his findings.” Id. (citations omitted). These considerations are particularly true in the areas of child support and rehabilitative alimony. Turpin v. Turpin, 699 So.2d 560, 564(17) (Miss.1997) (citations omitted).
I. CHILD SUPPORT
¶ 8. Awards of child support are governed by the guidelines set forth in Mississippi Code Annotated section 43-19-101 (Rev.2004). Those guidelines state that there is a rebuttable presumption that where there is one child who is due support, the non-custodial parent should pay child support in the amount of fourteen percent of his or her adjusted gross income, as defined within the statute. Miss. Code Ann. § 43-19-101(1). In situations where the non-custodial parent’s adjusted gross income exceeds $50,000 per year, as Dr. Smith’s income does, the chancellor “shall make a written finding in the record as to whether or not the application of the guidelines established in this section is reasonable.” Miss.Code Ann. § 43-19-101(4). The chancellor applied the fourteen percent statutory standard to Dr. Smith’s adjusted gross monthly income of $19,408.17. As a result, the chancellor ordered Dr. Smith to pay Ms. Smith child support in the amount of $2,717.14 per month.
¶ 9. In awarding the above amount of child support, the chancellor stated as follows:
The fact that [private school tuition] is part of basic support is a factor involved in the Court’s determination of the application of the statutory percentage of 14% to all of [Dr. Smith’s] income.... The Court finds that application of [the] guidelines to the full amount of income, not just the first $50,000, as reflected in [Dr. Smith’s] Rule 8.05 disclosures, is reasonable and appropriate, taking into consideration the lifestyle of the child and his parents, tuition costs for his possible attendance in private school, as well as the testimony of both parties in regards to Coleman’s extensive extracurricular activities and the fact that he would likely benefit from enhanced education activities not open to the average student. [Ms. Smith] has testified that she has no intention of going back to work until Coleman is 18, and intends to remain available and involved in the details of his day-to-day care and activities, and portions of these funds will obviously be used by her for her own day-to-day expenses as she performs parental duties and responsibilities.
On appeal, Dr. Smith argues that the chancellor “did not make the necessary findings to justify exceeding the $50,000 cap.” We disagree.
*373 ¶ 10. Section 43-19-101(1) does not state that fourteen percent of $50,000 is envisioned as a “cap” on the amount of child support a non-custodial parent can expect to pay a custodial parent. Instead, if the chancellor applies the child support guidelines found in section 43-19-101(1) to income in excess of $50,000, the chancellor must provide findings on the record pursuant to section 43-19-101(4) that it is reasonable under the circumstances to do so.
¶ 11. The criteria for determining whether deviation from the statutory guidelines is appropriate are found in Mississippi Code Annotated section 43-19-103(a-I) (Rev.2004), which include the following factors:
(a) Extraordinary medical, psychological, educational or dental expenses.
(b) Independent income of the child.
(c) The payment of both child support and spousal support to the obligee.
(d) Seasonal valuations in one or both parents’ incomes or expenses.
(e) The age of the child, taking into account the greater needs of older children.
(f) Special needs that have traditionally been met within the family budget even though the fulfilling of those needs will cause the support to exceed the proposed guidelines.
(g) The particular' shared parental arrangement, such as where the noncustodial parent spends a great deal of time with the children thereby reducing the financial expenditures incurred by the custodial parent, or the refusal of the noncustodial parent to become involved in the activities of the child, or giving due consideration to the custodial parent’s homemaking services.
(h) Total available assets of the obligee, obligor and the child.
(i)Any other adjustment which is needed to achieve an equitable result which may include, but [is] not ... limited to, a reasonable and necessary existing expense or debt.
¶ 12. In Peters v. Peters, 906 So.2d 64, 72(¶ 36) (Miss.Ct.App.2004), this Court affirmed a chancellor’s decision to order a father whose adjusted gross income exceeded $50,000 per year to pay child support in accordance with the guidelines set forth in section 43-19-101(1). In so doing, the chancellor found no “reason to deviate from the statutory child support guideline of twenty percent of the adjusted gross income.” Id.; See Miss.Code Ann. § 43-19-101(4). This Court concluded that “when this statement is taken in the context of the chancellor’s opinion as a whole, it is apparent why the chancellor, given the facts and circumstances of the case, saw no reason to deviate from the statutory guidelines.” Id. (internal quotations omitted). Additionally, this Court found that although the chancellor’s statement was “rather succinct,” the statement constituted “nonetheless a written finding of reasonableness.” Id.
¶ 13. In the case at bar, the chancellor sufficiently articulated why he found it reasonable under the circumstances for Dr. Smith to provide fourteen percent of his income to Coleman for child support. See id.; C.A.M.F., 972 So.2d at 666-67(44). For example, in Hensarling v. Hensarling, 824 So.2d 583, 588(14) (Miss.2002), a case with facts similar to the ones at bar, the supreme court upheld the chancellor’s award of child support and explained its holding in the following manner:
[T]he chancellor found that special circumstances so exist which would “necessitate a variance from the statutory guidelines in setting Ken’s obligation of child support.” He noted that as a doctor, Ken has the ability to earn a sub *374 stantial income, whereas at this time, Brenda has no source of income other than the rehabilitative alimony she will receive for a few years. Also, the children have special needs which he deemed to include private school tuition, as the children’s friends and “daily routines and activities” stem from them attending private school. We find that these reasons meet the criteria set out in Miss.Code Ann. § 43-19-103(0 & (h).

Id.

¶ 14. Like the father in Hensarling, Dr. Smith, as a skilled medical professional, has the ability to earn a substantial income, whereas at this time, Ms. Smith does not. Additionally, as the chancellor in Hensarling considered the children’s private school tuition and related educational activities, so did the chancellor in this case. Here, Coleman’s private school tuition and enhanced educational activities meet the criteria in section 43-19-103(a). Coleman’s extracurricular activities and the lifestyle to which the family was accustomed meet the criteria in section 43-19-103(f).
¶ 15. Taking all of the chancellor’s findings above into consideration and in the context of the chancellor’s opinion as a whole, we find that the chancellor in this case possessed the best position to decide whether it was reasonable to apply the fourteen percent statutory standard to Dr. Smith’s adjusted gross monthly income. See Peters, 906 So.2d at 72(¶ 36). In following the precedent of Peters and Hen-sarling, while also respecting our standard of review, we affirm the chancellor’s award of child support.
II. REHABILITATIVE ALIMONY
¶ 16. At the conclusion of the chancellor’s thorough analysis of the Armstrong[1] factors, he stated as follows:
Having considered the financial disclosures, and the evidence as it is affected by the Armstrong factors noted above, the Court finds that [Dr. Smith] should contribute monthly periodic alimony to [Ms. Smith] ... in the amount of $2,000.00 ... together with the sum of $500.00 per month rehabilitative alimony for a period of 24 months.
Dr. Smith argues that the record fails to support the chancellor’s award of rehabilitative alimony, and as such, he urges this Court to reverse and render that portion of the chancellor’s order.
¶ 17. “Rehabilitative alimony provides for a party who is trying to become self-supporting and prevents that party from becoming destitute while searching for a means of income.” Voda v. Voda, 731 So.2d 1152, 1155(¶ 8) (Miss.1999). Moreover, “[t]he primary purpose of rehabilitative alimony is to give the former spouse the opportunity to enter the work force.” Alexis v. Tarver, 879 So.2d 1078, 1080(7) (Miss.Ct.App.2004).
¶ 18. In his opinion, the chancellor provided the following findings (among others not listed) under the Armstrong factors when he granted Ms. Smith rehabilitative alimony: (1) Dr. Smith was capable of making in excess of $300,000 per year while Ms. Smith had worked as a homemaker (at Dr. Smith’s insistence) and presently is a homemaker; (2) Dr. Smith had significant earning capacity, while Ms. Smith would have to attend classes and renew professional licenses in order to become a nurse again; (3) Ms. Smith had full custody and care of Coleman; (4) Ms. Smith at age forty-three was assumed to be able to continue her present abilities; and (5) the couple shared an “unusually high standard of living” both during the marriage and presently. Based on the *375 above analysis, the argument that the chancellor failed to make findings as to the propriety of rehabilitative alimony falls short.
¶ 19. The rehabilitative alimony awarded to Ms. Smith would serve the purpose of preparing her to reenter the work force when their son reaches the age of eighteen. See Alexis, 879 So.2d at 1080(7). This Court yields to the chancellor’s discretion in light of the limited and restrained review under which this Court examines such cases. See C.A.M.F., 972 So.2d at 666-67(44).
III. APPRAISAL VALUE OF THE MARITAL HOME
¶ 20. As part of the chancellor’s distribution of the Smiths’ marital assets, the chancellor awarded Dr. Smith the marital home and ordered him to pay Ms. Smith her portion of the home’s equity. The chancellor set the value of the Smiths’ marital home at $599,000, stating:
Testimony and an appraisal (Exhibit 17 for identification) sought to be admitted at trial and shortly before trial began, reflected that the valuation may be shown as less than this, but the figure of $600,000.00 was established by the jointly approved appraisal performed exactly 9 months to the day before trial began and was represented by both in deposition, and through counsel in preparation for trial, to be the correct one up [sic] (and reduced slightly but still agreed on at $599,000 in Exhibit 2, the “Hemsley Report” jointly stipulated into evidence,!) ] until just before the trial, well after discovery had been completed. The Court finds the parties bound themselves to that figure.
Dr. Smith argues that the chancellor erred in failing to accept a more recent appraisal of the home. Dr. Smith also claims that he did not stipulate to the $599,000 figure.
¶ 21. The “Hemsley Report” does indeed list the value of the Smiths’ marital home at $599,000; however, during the colloquy immediately following admittance of the report, Dr. Smith’s attorney expressed concern over some items listed in the report. Specifically, he stated: “the first item of this one has to do with [the Smiths’ marital home]. The value reflected there is [$]599[,000], That value is in question.” The chancellor subsequently admitted the “Hemsley Report,” but he found that the valuation of the marital home required additional testimony.
¶ 22. Throughout the hearing, both Dr. Smith and Ms. Smith testified regarding the marital home’s appraisal and value. The first appraisal was ordered after Ms. Smith filed for a divorce. According to that appraisal, the home’s value was approximately $600,000. The marital home was placed on the market as the divorce went forward over the next several months, but it received one offer for $450,000 and another for $500,000. Dr. Smith testified that although he initially believed the first appraisal was correct, after the home failed to garner an offer close to the $600,000 appraisal, he looked closer at the appraisal and noticed it seemed to overvalue the home in certain respects.[2] As such, Dr. Smith felt it prudent to order another appraisal. However, Dr. Smith also testified that during his deposition, he stated that he agreed the house was worth $599,000, that he did not believe anything was wrong with the ap *376 praisal, and that he was not going to order another one.
¶ 23. Although reversal of a chancellor’s decision not to order an updated appraisal of a marital home is not unheard of, we find that the facts of this case do not warrant such an outcome. See Saucier v. Saucier, 830 So.2d 1261, 1265(¶ 12) (Miss.Ct.App.2002) (reversing and remanding a chancellor’s decision not to order a more recent appraisal as a result of questions regarding the use of insurance proceeds on the home and the monetary effect of repairs made after hurricane). It is clear that at some point Dr. Smith acquiesced to the appraised value of $599,000-$600,000, and there was no expert testimony that the initial appraisal was faulty. Additionally, the delay between the completion of the appraisal and the division of marital assets was not unreasonable. As such, we cannot say that the chancellor erred in finding that Dr. Smith bound himself to that figure. This issue is without merit.
IV. EQUITABLE DIVISION OF ASSETS
¶ 24. Dr. Smith argues that the chancellor’s equitable distribution did not fully take into account the fact that Dr. Smith agreed to take responsibility for virtually all of the Smiths’ marital debt. As the chancellor stated in his opinion regarding the process of property division:
The case of Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994), established the guidelines that chancellors are to consider when deciding issues of marital property division. In that case, [the supreme court] directed “chancery courts [to] consider the following guidelines, where applicable, when attempting to effect an equitable division of marital property:
1.Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
c. Contribution to the education, training or other accomplishment bearing on the earning power of [t]he spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise[;]
3. The market value and the emotional value of the assets subject to distribution^]
4. The value of assets not ordinarily, absent equitable factors to the contrary subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and
8. Any other factor which in equity should be considered.
*377 Ferguson, 639 So.2d at 928.
[[Image here]]
The procedure for dividing marital property was explicitly established in Johnson v. Johnson, 650 So.2d [1281,] 1287 [ (Miss.1994) ]. That case states that:
First, the character of the parties’ assets, i.e., marital or nonmarital, must be determined pursuant to Hemsley. The marital property is then equitably divided, employing the Ferguson factors as guidelines in light of each parity’s] nonmarital property. Ferguson, 639 So.2d at 928. If there are sufficient marital assets which, when equitably divided and considered with each spouse’s nonmarital assets, will adequately provide for both parties, no more need[s] to be done. If the situation is such that an equitable division of marital property, considered with each party’s nonmarital assets, leaves a deficit for one party, then alimony based on the value of nonmarital assets should be considered. This process does not require divestiture of inherited or gift-acquired nonmarital property.

Id.

¶ 25. Utilizing the above standards, the chancellor proceeded to categorize and distribute the Smiths’ assets and liabilities. After a lengthy recitation of the assets and liabilities as determined by testimony, stipulations, and other evidence, the chancellor awarded Ms. Smith a total of $609,545.48 in assets and $295,000 in liabilities, giving Ms. Smith a net award of $314,545.48. The chancellor awarded Dr. Smith $1,094,495.48 in assets and $734,435.51 in liabilities, giving Dr. Smith a net award of $360,059.97. Contrary to Dr. Smith’s view of the chancellor’s opinion, it is clear that the chancellor factored in all of the debts ultimately awarded to Dr. Smith when dividing the Smiths’ marital estate. This issue is without merit.
V. ATTORNEY’S FEES
¶ 26. At Ms. Smith’s request, the chancellor ordered Dr. Smith to pay Ms. Smith attorney’s fees in the amount of $15,340 — a figure that represents one-half of the attorney’s fees Ms. Smith requested. Dr. Smith asserts that the chancellor abused his discretion. Naturally, Ms. Smith disagrees and, in addition, requests that this Court order Dr. Smith to pay a portion of her attorney’s fees incident to this appeal.
¶ 27. The decision whether to award attorney’s fees in domestic cases is largely a matter entrusted to the chancellor’s sound discretion. Kelley v. Kelley, 953 So.2d 1139, 1144(¶ 14) (Miss.Ct.App.2007). Unless the chancellor abuses that discretion, we will uphold his or her decision on appeal. Id. However, as a general rule, attorney’s fees are not awarded unless the party requesting the fees has established an inability to pay. Id.
¶ 28. We cannot find that the chancellor abused his discretion. The chancellor found that Dr. Smith had a substantial income, and Ms. Smith had no income. However, the chancellor also found that, after his equitable distribution and alimony awards, Ms. Smith had the “ability to contribute ... toward [the] costs of [her] representation.” The chancellor weighed both factors and held that Dr. Smith should only be obligated to pay one-half of Ms. Smith’s legal expenses. This issue is without merit.
¶29. As for Ms. Smith’s request for attorney’s fees incident to the present appeal, such requests are not unheard of. To support her request, Ms. Smith relies on Lauro v. Lauro, 924 So.2d 584, 592(¶ 33) (Miss.Ct.App.2006) in which this Court stated that we have “generally *378 awarded attorney’s fees on appeal in the amount of one-half of what was awarded in the lower court.” (quoting Monroe v. Monroe, 745 So.2d 249, 253(¶ 17) (Miss.1999)). We follow that precedent and award Ms. Smith attorney’s fees on appeal in the amount of $7,670.
¶ 30. THE JUDGMENT OF THE LAMAR COUNTY CHANCERY COURT IS AFFIRMED. THE APPELLEE’S MOTION FOR ATTORNEY’S FEES ON APPEAL IS GRANTED IN THE AMOUNT OF $7,670. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., GRIFFIS AND BARNES, JJ„ CONCUR. ROBERTS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY ISHEE, J., AND JOINED IN PART BY IRVING, J. KING, C.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. MAXWELL, J., NOT PARTICIPATING.

. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993).

. Dr. Smith stated that the recent real estate sales used in the appraisal were of houses that were on the golf course or on the lake side of the Smiths' neighborhood, and the house in question was neither on the golf course nor the lake. Additionally, Dr. Smith believed the listed square footage was misleading because it included a media room that was not connected to the house.