# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-00093-SCT

*IN THE MATTER OF THE DISSOLUTION OF
THE MARRIAGE OF JAMES LEVEROCK AND
DEANNA HAMBY: BRENT KEITH PENDLETON
AND KIM RENEE PENDLETON*

*v.*

*JAMES ANTHONY LEVEROCK*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/09/2007 |
| TRIAL JUDGE: | HON. JAMES H. C. THOMAS, JR. |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | RENEE M. PORTER |
| ATTORNEYS FOR APPELLEE: | BRANDON L. BROOKS |
| | SHIRLEE FAGER-BALDWIN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART - 12/03/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.    Zachary Tyler Leverock (Zach) was born to Deanna Hamby and James Anthony Leverock (Tony).  Upon the couple's separation, Deanna and Zach moved in with her foster parents, the Pendletons.  For the following two and a half years, Zach lived with the Pendletons with no contact from Tony.  Deanna died in a car accident, and at her funeral, Tony told the Pendletons that he eventually wanted to take Zach back to Florida with him.

The Pendletons filed a complaint for emergency temporary custody, termination of parental rights, and for custody. A trial was held, and Tony received custody of Zach.

¶2. The Pendletons assert that the chancery court erred by refusing to: (1) terminate Tony's parental rights; (2) award the Pendletons custody after finding the best interests of the child would be to remain in their care; (3) grant visitation; and (4) deem requests for admission admitted despite an untimely response.

**FACTS**

¶3. Tony and Deanna met while they were enrolled in the Job Corps program. The two married on May 24, 2002. Tony enlisted in the Army, and they moved to Fort Bragg, North Carolina. Deanna gave birth to the couple's son, Zach, on May 18, 2003, while Tony was serving in Iraq. He returned from overseas when Zach was approximately four months old. Three months later, on January 6, 2004, the couple separated, and Deanna and Zach returned to Mississippi.

¶4. Deanna and Zach moved into the house with her foster parents, Brent and Kim Pendleton, who began serving as Deanna's foster parents when she was sixteen years old. Deanna lived with the Pendletons sporadically upon her return from Fort Bragg, but Zach lived almost exclusively with the Pendletons from that time until custody was awarded to Tony in November 2007.

¶5. Soon after Deanna returned to Mississippi, Tony was "other than honorably discharged" from the Army for failing repeated drug tests. He went back to his hometown of Jacksonville, Florida, and moved in with his girlfriend Jennifer Cooper, Jennifer's mother,

2

her mother's boyfriend, and her sister. Tony and Jennifer had a child on May 24, 2005. He remained legally married to Deanna at that time.

¶6. Tony admitted that he had no contact with Zach from the time Zach left Fort Bragg in January 2004, until May 2006, except for a few moments in June 2004, when Deanna traveled to Florida to give Tony divorce papers. According to the divorce papers, Deanna was to have full legal and physical custody of Zach with Tony having reasonable visitation. Tony also agreed to pay child support in the amount of $350 per month. The divorce papers were not filed until January 2006, and the divorce was never granted. Tony did not exercise any visitation nor did he pay any child support as specified in the divorce petition and agreement.

¶7. Tragically, on May 13, 2006, Deanna was killed in a car accident in Laurel, Mississippi. Tony came to her funeral and asked the Pendletons if he could see his son. Zach did not recognize his father. After Deanna's funeral, Tony indicated to the Pendletons that he was interested in forging a relationship with the child. Tony testified that he simply wanted to start spending time with Zach, and when Zach knew who his real father was, he wanted to take him back to Florida. On May 18, 2006, the Pendletons filed a complaint for emergency temporary custody and termination of Tony's parental rights. Shortly after returning from Deanna's funeral, Tony moved with his girlfriend and their child into the home of his father and stepmother in Florida.

¶8. On May 22, 2006, the chancery court awarded temporary custody to the Pendletons,

finding that they had been the primary caretakers of Zach for more then two years, and it was in Zach's best interests for the Pendletons to be vested with temporary custody. On July 25, 2006, the court appointed a guardian ad litem (GAL), ordered Tony to begin paying child support, and indicated that once the GAL had evaluated Zach, a visitation schedule would be set. The chancellor then devised a visitation schedule that gradually increased visitation from a few hours every other weekend in Purvis, Mississippi, to two-week-long visitations in Florida.

¶9. At trial, the Pendletons presented nine witnesses in support of their contention that Tony had abandoned his son and that a substantial erosion of the relationship had occurred. Tony's mother, sister, and stepfather testified in favor of the Pendletons. Tony, his father, and Dr. Pat Galloway, a family counseling expert, testified in favor of Tony. The GAL also testified.

¶10. Tony admitted that he had never paid any child support, had never sent any type of birthday or Christmas present, nor had he attempted to exercise any type of visitation since his wife had left Fort Bragg, until the time he came to her funeral, approximately two and a half years later. He maintained at trial that he did not know where Deanna was living, that he had been unable to get in touch with her, and that he had never sent money or gifts because he did not know where to send them.

¶11. Tony's mother and sister both testified that they had been in continuous contact with the Pendletons, Zach, and Deanna from the time Deanna and Tony had separated. This contact consisted of visits to Mississippi as well as paying for Deanna and Zach to visit them

4

in Florida. Tony's mother indicated she regularly had encouraged Tony to be more involved with his child, but he had refused. She also testified that she had told Tony where Zach was living and how to contact him and the Pendletons. Tony's paternal grandparents were also involved with Zach and went to visit Zach at the Pendletons' residence several times a year. Tony's mother, sister, and grandparents all described a close, parent-child relationship between the Pendletons and Zach. Tony's father, with whom he lived after moving out of his girlfriend's house, painted a different picture of the Pendletons. He stated that the Pendletons were uncooperative the one time he attempted to call them and check on Zach.

¶12. Evidence was presented that Zach was not easily coping with the increased contact with his father and that the Pendletons had been taking him to therapy as the visitation schedule allowed. Zach's counselor testified for the Pendletons, claiming that Zach was afraid of Tony's stepmother because she allegedly had slapped him. Tony and his father denied that Zach was having trouble adjusting to the prolonged visitation in Florida. The GAL and the family counseling expert both testified that Tony had shown improvement in his parenting skills and should be allowed to regain custody of Zach.

¶13. On November 9, 2007, the chancellor found that the custody, support, and property settlement agreement did not reflect any intention by Tony to irrevocably abandon Zach before Deanna's death. He also noted Tony's actions after Deanna's death in restoring his relationship with Zach. The chancellor adopted the recommendations of the GAL and Dr. Galloway that Zach be returned to his father. The Pendletons appeal this decision by the chancellor.

## DISCUSSION

I. **WHETHER THE CHANCELLOR ERRED IN REFUSING TO TERMINATE THE NATURAL FATHER'S PARENTAL RIGHTS**.

¶14. Appellate review in a case to terminate parental rights is the manifest error/substantial credible evidence test. *S.N.C. v. J.R.D., Jr.*, 755 So. 2d 1077, 1080 (Miss. 2000). As long as there is credible evidence to support the chancellor's findings of fact, we must affirm the decision. *K.D.F. v. J.L.H.*, 933 So. 2d 971, 976-77 (Miss. 2006). "We will examine the case de novo, however, when it is clear that the chancery court's decision resulted from a misunderstanding of the controlling law or was based on a substantially erroneous view of the law." *R.L. v. G.F.*, 973 So. 2d 322, 324 (Miss. Ct. App. 2008).

¶15. The Pendletons requested that the chancellor find abandonment and/or unfitness, terminate Tony's parental rights, and award them custody. In refusing to terminate the father's parental rights, the chancellor referenced Mississippi Code Section 93-15-103[1], which addresses adoption, not custody, and provides, in relevant part, that:

> (1) When a child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or *the parent is unable or unwilling to care for the child*, relatives are not appropriate or are unavailable, and when adoption is in the best interest of the child, taking into account whether the adoption is needed to secure a stable placement for the child and the strength of the child's bonds to his natural parents and the effect of future contacts between them, the grounds listed in subsections (2) and (3) of this section shall be considered as grounds for the

---

[1]Section 93-15-103 is a provision of the Termination of Rights of Unfit Parents Law. *See* Miss. Code Ann. §§ 93-15-101 to 93-15-111.

termination of parental rights. The grounds may apply singly or in combination in any given case.

. . .

(3) Grounds for termination of parental rights shall be based on one or more of the following factors:

. . .

> (b) A parent has made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year[.]
>
> . . .
>
> (f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment[.]

Miss. Code Ann. § 93-15-103(1),(3)(b), (3)(f) (Rev. 2004) (emphasis added). As noted in the trial court's judgment, subsection (1) of the statute provides certain criteria which must be met prior to a consideration of the grounds for termination. The following three prerequisites must exist before a chancellor can terminate parental rights: (1) the child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time or the parent is unable or unwilling to care for the child; (2) relatives are not appropriate or are unavailable; and (3) adoption is in the best interest of the child. Miss. Code Ann. § 93-15-103(1) (Rev. 2004). Because Zach was never removed from the home of his natural parents, the trial court examined whether Tony was unable or unwilling to care for his child. *See id.*

¶16.    The chancellor focused on the period of time following Deanna's death and found that Tony's actions had demonstrated that he was willing to care for Zach. The record reflects that at Deanna's funeral, Tony expressed an interest in forging a relationship with his son, and when ordered by the chancellor, began regularly visiting Zach and paying child support. As noted in the GAL's opinion, Tony did everything the chancellor and the Pendletons asked of him in order to prove his dedication to reuniting his family. Therefore, we find credible evidence to support the trial court's determination that the first condition of Section 93-15-103(1) was not met. Furthermore, the Pendletons failed to present any evidence as to the second condition or even to request adoption, much less prove that adoption was in Zach's best interest. We cannot say that the chancellor committed manifest error in finding that Tony was currently willing to care for his son, notwithstanding his history of failing to do so.

¶17.    Even where a chancellor finds one or more grounds which justify termination of parental rights, nothing in our law requires the chancellor to do so. Rather, Mississippi Code Section 93-15-109 provides that if the chancellor is satisfied by clear and convincing proof that grounds justifying termination of parental rights exist "then the court *may* terminate all the parental rights of the parent or parents . . . ." Miss. Code Ann. § 93-15-109 (Rev. 2004) (emphasis added). We have affirmed our chancellors in similar cases where they have refused to terminate parental rights yet still found sufficient grounds to award custody to third parties. *See, e.g., Veselits v. Cruthirds*, 548 So. 2d 1312, 1315-16 (Miss. 1989) (affirming custody award to third party and chancellor's refusal to terminate parental rights).

8

On the record before us, we cannot say the chancellor committed manifest error in refusing to terminate Tony's parental rights.

## II. WHETHER THE CHANCELLOR ERRED IN NOT AWARDING THE PENDLETONS CUSTODY.

¶18. At the outset of this discussion, we reaffirm that the paramount and ultimate goal in every child custody case must be the best interests of the child. This is a principle of law so deeply embedded in our jurisprudence that it should not require further elaboration or citation of authority. This is a difficult case. The chancellor framed the issue as follows:

> [T]he prevailing question presented is whether a natural father should now be allowed to raise his son who had been in a safe and secure environment with non family members when the father has not been actively involved in the son's life prior to his mother's death. There is no doubt the best interest of Zachary, at least in the short term, would lie in his remaining with the Pendletons where he has had a secure environment for the past few years.

Further, he concluded that "[i]t is not the best interest of Zachary to be determined but rather the question presented is whether the Defendant is fit and suitable to have custody of his son."

¶19. In Mississippi, it is presumed that it is in the best interest of a child to remain with the natural parent as opposed to a third party. *K.D.F. v. J.L.H.*, 933 So. 2d 971, 980 (Miss. 2006). This presumption is echoed in Mississippi Code Section 93-13-1: "The father and mother are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare and education. . . . If either father or mother die or be incapable of acting, the guardianship devolves upon the surviving parent." Miss. Code Ann. § 93-13-1 (Rev. 2004).

9

¶20.    However, we also recognize that this presumption or preference for a natural parent

may be rebutted.  That is, this presumption does not provide an absolute right in the parent

to raise his or her child, rather it creates a presumptive right which must give way if

relinquished by the parent either through abandonment, desertion, or other unfitness, and if

it is otherwise overcome by an overriding concern for the best interest and welfare of a child.

These sentiments are reflected in our custody statute, Section 93-5-24, which provides that:

> (1) Custody shall be awarded as follows according to the *best interests* of the
> child . . . . (e) Upon a finding by the court that both parents of the child have
> *abandoned or deserted* such child *or* that both such parents are mentally,
> morally or *otherwise unfit* to rear and train the child the court may award
> physical and legal custody to: (i) The person whose home the child has been
> living in a wholesome and stable environment; or (ii) Physical and legal
> custody to any other person deemed by the court to be suitable and able to
> provide adequate and proper care and guidance for the child.

Miss. Code Ann. § 93-5-24(1)(e)(i)-(ii) (Rev. 2004) (emphasis added).[2]

¶21.    This presumption in favor of a natural parent has long been recognized, and Tony is

entitled to it unless there is proof that he has relinquished it.  On the other hand, our law does

not recognize that the Pendletons have any right to Zach's custody.  We do, however,

recognize the doctrine of *in loco parentis*.  "We have defined a person acting *in loco parentis*

---

[2]Relevant to these proceedings, this Court has defined the terms abandonment and
desertion. ***Ainsworth v. Natural Father***, 414 So. 2d 417, 419 (Miss. 1982).  Abandonment
is "any conduct on the part of the parent which evinces a settled purpose to forego all duties
and relinquish all parental claims to the child." ***Id***.  In defining the term "desert," this Court
in ***Ainsworth*** noted the following definitions: "2. To forsake (a person, institution, cause,
etc., having a moral or legal claims upon one). 3. To forsake one's duty, one's post or one's
party." ***Id.*** at 420.  This Court explained that "abandonment has to do with the
relinquishment of a right or claim, whereas desertion involves an avoidance of a duty or
obligation." ***Id.***

as one who has assumed the status and obligations of a parent without a formal adoption." *Logan v. Logan*, 730 So. 2d 1124, 1126 (Miss. 1998). The record shows that the Pendletons took Zachary into their home and provided parental supervision and support as though he were their own child and as such, they are said to have acted *in loco parentis*. *See Farve v. Medders*, 241 Miss. 75, 128 So. 2d 877, 879 (1961).

¶22. After reviewing the record and the chancellor's findings, we find that in evaluating custody the chancellor failed to address Tony's complete and total absence of any contact or support for two and a half years of three-year-old Zach's young life. The chancellor clearly focused on Tony's current desire to have custody of Zach. The undisputed record before us reveals that for approximately two and a half years, Tony had no contact with Zach. He failed to see, talk with, or otherwise visit his son. Further, Tony provided no financial support during this time, nor did he send any birthday or Christmas cards or gifts to Zach. While Tony maintained that he was unable to contact Deanna and Zach, Tony's mother and sister testified that they were in continuous contact with the Pendletons, Deanna, and Zach. Tony's mother also testified that she had encouraged Tony to be more involved with his child but that he had refused. The record also reflects that after Deanna's death, Tony did take appropriate steps to re-establish a relationship with his son. While commendable, this does not negate his glaring absence from Zach's life at the time of, and in the two-and-one-half years prior to, the Pendletons' request for custody.

¶23. We find on the record before us as a matter of law that Tony's actions (or lack thereof) during the two and a half years before Deanna's death constitute desertion. Tony chose to

11

completely avoid both his moral and legal duties and obligations as a father for more than two years. During this period of time, he showed a complete disregard for the welfare of his young son. We find that, even assuming everything Tony said is true, it is insufficient for a reasonable fact-finder, in the exercise of discretion, to conclude that Tony did not desert his child. While the chancellor did not make findings of fact as to whether Tony's actions prior to Deanna's death constituted either abandonment or desertion, we see no reason to remand this question to the chancellor as our respected colleague suggests. We find that on the facts of this case and the developed record before us that it would be manifest error to conclude that desertion had not been shown.

¶24. A finding that there was desertion however, does not end the inquiry. In a custody case involving a natural parent and third party, the court must first determine whether through abandonment, desertion, or other acts demonstrating unfitness to raise a child, as shown by clear and convincing evidence, the natural parent has relinquished his right to claim the benefit of the natural-parent presumption. If the court finds one of these factors has been proven, then the presumption vanishes, and the court must go further to determine custody based on the best interests of the child through an on-the-record analysis of the *Albright*[3] factors. ***In re Custody of M.A.G.***, 859 So. 2d 1001, 1004 (Miss. 2003); *see **K.D.F.***

---

[3]***Albright v. Albright***, 437 So. 2d 1003, 1005 (Miss. 1983). In ***Albright***, the Court set forth the following factors to be considered by our chancery courts in determining custody:

> The age of the child . . . is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care

*v. J.L.H.*, 933 So. 2d 971, 981 (Miss. 2006); ***Logan v. Logan***, 730 So. 2d 1124, 1127 (Miss. 1998). In addition to the ***Albright*** factors, although Tony is not entitled to a presumption in his favor, we conclude that it is entirely appropriate to take into account society's interest in preserving the natural parent and child relationship whenever possible. The chancellor should give this factor whatever weight is appropriate under the facts of the case, but it is only one factor, among many, to be considered.

¶25. At the age of four, Zach was taken from the only home he had known since he was seven months old, a home the chancellor described as a "safe and secure environment," and it was done without a finding that this change was in his best interests. Rather, the chancellor's decision seems to rest entirely on Tony's right as a natural parent to raise his child. Tony chose "to take an extended holiday from the responsibilities of parenthood" and we find that he should not now be able to claim the benefit of his status as a natural parent to obtain custody without a showing that it would be in Zach's best interest. ***Guardianship of Plucar v. Plucar***, 72 N.W.2d 455, 460 (Iowa 1955), *superceded by statute on other grounds*, Iowa Code §§ 633.33, 633.55, *as recognized in **In re Guardianship of Murphy***, 397 N.W. 2d 686 (Iowa 1986). Because we find the evidence of desertion is clear, we find

> prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.

***Id.***

13

the chancellor erred in awarding custody to the natural father without an on-the-record analysis of the child's best interests utilizing the *Albright* factors. We remand this case for the trial court to proceed with a best interests analysis based on the *Albright* factors. We also recognize that two years have passed since this hearing, and we direct the chancellor to fully consider the present circumstances of the parties and Zach in determining this custody issue.

### III. WHETHER THE CHANCELLOR ERRED IN REFUSING TO DEEM REQUESTS FOR ADMISSION ADMITTED DESPITE AN UNTIMELY RESPONSE.

¶26. "Matters of discovery are left to the sound discretion of the trial court, and discovery orders will not be disturbed unless there has been an abuse of discretion." *Scoggins v. Baptist Mem'l Hosp.-DeSoto*, 967 So. 2d 646, 648 (Miss. 2007) (quoting *Earwood v. Reeves*, 798 So. 2d 508, 516 (Miss. 2001)).

¶27. The Pendletons argue that the chancery court erred by denying their motion to deem their requests for admission admitted by Tony, as he was more than sixty-four days late in responding. The Pendletons propounded requests for admission on August 8, 2006. Notice of service was filed on September 25, 2006. The requests for admission were finally answered on November 10, 2006. The Pendletons requested at the start of trial that the chancellor deem various requests for admission admitted by Tony, due to his untimely response. Tony's counsel admitted at trial that no extension was requested nor did he offer any explanation for the delay. Tony counter-argued that he received notice of the motion to deem those answers admitted only on the eve of trial, and, more importantly, that deeming

14

the answers admitted would take away some of the chancellor's discretion. The chancellor determined that the Pendletons' motion was not timely filed.

¶28. We find that it was unnecessary for the Pendletons to petition the chancellor to deem the requests for admission admitted. Consequently, the chancellor was in error for denying the request as being untimely filed. According to Mississippi Rule of Civil Procedure 36(a), a "matter is admitted unless, within thirty days after service of the request . . . the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by his attorney." Thus, a judge does not have the discretion to deem the matter admitted, because a request is conclusively established upon a party's failure to answer within thirty days, or such time as the judge has determined appropriate. Miss. R. Civ. P. 36(b). The trial court, may, however, permit withdrawal or amendment of the admission. *Id.* Rule 36 is to be applied as written, but "it is not intended to be applied in Draconian fashion. If the Rule may sometimes seem harsh in its application, the harshness may be ameliorated by the trial court's power to grant amendments or withdrawals of admissions in proper circumstances." ***DeBlanc v. Stancil***, 814 So. 2d 796, 801-02 (Miss. 2002). The rule was intended to be used as a means to determine which facts are not in dispute, not as a way to avoid adjudication of contested issues. *Id*.

¶29. In *Scoggins*, the plaintiff failed to answer requests for admissions until 148 days after they were propounded by the defendants. *Scoggins*, 967 So. 2d at 648. This Court upheld the circuit court's finding that requests for admission were admitted. *Id*. at 649. In doing so,

15

the Court also stated that the trial court's determination that the requests for admission were admitted by operation of law was not an abuse of discretion. *Id*. at 649. The Court stated that "[w]e are compelled to acknowledge that adage that rules are promulgated for a purpose, this being precisely an instance in which the principle applies." *Id*. (quoting *Earwood v. Reeves*, 798 So. 2d 508, 516 (Miss. 2001)). Further, in *Scoggins*, this Court noted that any difficulty with the case "could easily have been eliminated if a motion to withdraw or amend the answers had been filed pursuant to Rule 36(b) and if there were justifiable excuse." *Id*. (quoting *Martin v. Simmons*, 571 So. 2d 254, 257 (Miss. 1990)).

¶30. Notwithstanding this Court's decision in *Scoggins*, the Mississippi Court of Appeals has addressed this issue in a child custody matter. In *Gilcrease v. Gilcrease*, 918 So. 2d 854, 856 (Miss. Ct. App. 2005), the Court of Appeals reviewed a chancellor's finding that requests for admissions propounded to the mother were deemed admitted for failure to respond. *Gilcrease*, 918 So. 2d at 856. When the chancellor determined the best interests of the child, however, she ignored one of the admissions that directly dealt with that issue. *Id*. at 857-58. The admission was that the best interest of the child would be placing the child in the custody of the father. *Id*. at 858. Aggrieved, the father appealed the chancellor's decision which awarded custody to the mother. *Id*. at 856.

¶31. The Court of Appeals affirmed the decision and found that the chancellor acted appropriately in the custody case as custody is a judicial, not an evidentiary, determination. *Gilcrease*, 918 So. 2d at 858-59. The court found that the chancellor's "actions were manifestly appropriate, as the folly of allowing child custody cases to be determined by

16

admission is self-evident." *Id*. at 859. Further, the court stated "[n]o right-minded chancellor should ever allow the custody of a child to be determined, in light of the possible dire consequences to the child, based upon a Rule 36 admission." *Id*.

¶32. Nonetheless, the Court of Appeals also found that the chancellor made a procedural error by ignoring the admission sua sponte. *Gilcrease*, 918 So. 2d at 859. The better course, according to the court, would have been for the chancellor to "follow proper procedure to grant amendment or withdrawal as set forth in Rule 36." *Id*. However, the mother never filed a motion to withdraw, therefore, the court found that the chancellor erred by ignoring the admission. *Id*. The error, however, was committed with a "proper result in mind," the polestar consideration of the best interests of the child. *Id*. In this context, the Court of Appeals found no substantive error and affirmed the chancellor's award of custody to the mother. *Id.*

¶33. It was error for the chancellor to refuse to deem the Pendletons' requests for admission admitted at trial. The requests were admitted upon the thirty-first day after the Pendletons served the request. In light of the fact that this Court is reversing and remanding on the custody issue for an *Albright* analysis, Tony has the opportunity to file a motion for amendment or withdrawal as set forth in Rule 36, and the Pendletons have an opportunity to respond to any such motion.

**CONCLUSION**

¶34. We affirm the chancellor's decision not to terminate Tony's parental rights. However, we reverse and remand this case for a hearing to determine whether Zach's interests are best

17

served by awarding custody to the Pendletons or to Tony based upon a traditional best-interests *Albright* analysis. In addition, this Court reverses the trial court's denial of the request to deem the requests for admission as admitted.

¶35. **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

**WALLER, C.J., GRAVES, P.J., DICKINSON, RANDOLPH AND CHANDLER, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. PIERCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, P.J., AND JOINED IN PART BY WALLER, C.J.**

**KITCHENS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶36. I agree with the majority's determination that the chancellor did not err in refusing to terminate the father's parental rights, and our analyses of this issue do not differ. However, I respectfully dissent from the majority's conclusion that the father abandoned the child and is not entitled, therefore, to the natural-parent presumption, as such a finding requires a factual determination, which is to be made by a chancellor and given great deference by this Court.

¶37. This case turns on the standard of review, which appropriately defines and limits the parameters of our analysis. In child-custody matters, "review by this Court is 'quite limited in that the Chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this Court to reverse.'" *In re Custody of M.A.G.*, 859 So. 2d 1001, 1004 (Miss. 2003) (quoting *M.C.M.J. v. C.E.J.*, 715 So. 2d 774, 776 (Miss. 1998)). "Where a Chancellor has applied the correct legal standard and made findings of fact which are supported by substantial evidence, this Court will not reverse her decision." *Id.* (citing *Touchstone v. Touchstone*, 682 So. 2d 374, 377 (Miss. 1996)). "Under this standard, the

Court asks not how it would have decided the case ab initio, but whether there is credible proof to support the chancellor's findings of fact by clear and convincing evidence." *In re Adoption of Minor Child,* 931 So. 2d 566, 571 (Miss. 2006) (citing *S.N.C. v. J.R.D., Jr.*, 755 So. 2d 1077, 1080 (Miss. 2000)).

¶38. In its opinion, the majority has not only failed to cite the standard of review, it also has failed to adhere to it. Simply pronouncing that the chancellor erred does not, in my view, justify reversal of a chancellor. This Court has stated that:

> We may not always agree with a chancellor's decision as to whether the best interests of a child have been met, especially when we must review that decision by reading volumes of documents rather than through personal interaction with the parties before us. However, in custody cases, we are bound by the limits of our standard of review and may reverse only when the decision of the trial court was manifestly wrong, clearly erroneous, or an erroneous legal standard was employed.

*K.D.F. v. J.L.H.*, 933 So. 2d 971, 980 (Miss. 2006) (quoting *Hensarling v. Hensarling*, 824 So. 2d 583, 586-87 (Miss. 2002)).

¶39. Here, the Pendletons were given fair opportunity to adduce evidence in an effort to overcome the venerable presumption that favored the child's biological father by proving that the father had abandoned or deserted the child. They tried mightily to do that; however, before the chancellor was credible testimony, supported by documentation, that the mother never stayed in one place for very long, and that when she moved, she took the child with her. The father testified that when the mother was on the move, as was frequently the case, she could never be reached by calling the same telephone number twice. In fact, when he was able to contact her, his telephone records entered into evidence showed that the numbers at which the father was able to speak with the mother were listed in Meridian, Hattiesburg, and Jackson. He testified that these were among the circumstances that inhibited his

19

contacting the child between 2004 and 2006, and that he did not know where to look for his son or where to send gifts or child-support payments.

¶40.   When considering these facts, along with the father's testimony that, when he called the Pendletons, they informed him that the mother and the child did not live with them, I cannot say that the chancellor was manifestly wrong in finding that the father did not abandon or desert his son.  Similarly,  the guardian ad litem, who investigated the case over the course of fourteen months, did not say that the father had abandoned or deserted the child.  Instead, the guardian ad litem testified that "[the mother] left; [the father] could not find her; [the father] could not find the child."

¶41.   In sum, the chancellor weighed the evidence and found that the Pendletons had failed to rebut the presumption that gives a natural parent the paramount right to custody of his own child.  Given the applicable standard of review and the evidence before the chancellor, I would affirm the chancellor's judgment that custody of this child be granted to his natural father. Therefore, I would affirm.

**PIERCE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶42.   Black's Law Dictionary defines "appellate court" as "a court having jurisdiction of appeal and review of decisions of lower courts . . . . A reviewing court, and, except in special cases where original jurisdiction is conferred, not a 'trial court' or court of first instance." Black's Law Dictionary 64 (6th ed. 1991). Appellate jurisdiction is defined as  "[t]he power of a court to review and revise a lower court's decision." Black's Law Dictionary 868 (8th ed. 2004). In contrast, a chancellor is a "judge serving on a court of chancery . . . . or equity." *Id*.

20

¶43.   Section 159 of the Mississippi Constitution provides that chancery courts have full jurisdiction over cases involving minors. Miss. Const. 6 Art., § 159. The Legislature has further codified that jurisdiction. Jurisdiction over adoption is vested exclusively in chancery court. Miss. Code Ann. § 93-17-3(1) (Rev. 2004). Chancery courts and family and county courts sitting as youth courts retain exclusive jurisdiction over hearings to terminate parental rights. Miss. Code Ann.§ 93-15-105(1) (Rev. 2004). Lastly, exclusive jurisdiction is defined as a "court's power to adjudicate an action or class of actions to the exclusion of all other courts." Black's Law Dictionary 869 (8th ed. 2004).

¶44.   The majority has confused these terms, and now believes it is the job of this appellate court to take on the role of a chancellor. The majority makes a finding on abandonment and/or desertion in connection with the custody statute when the chancellor failed to make that original determination. It is the job of an appellate court to review the decision of the chancellor, not to make an original determination. It is the duty of this court to defer to the exclusive jurisdiction of the chancery court and only to review the decisions of the chancellor under the appropriate standard of review.

¶45.   The chancellor's findings of fact concerning the termination of parental rights are viewed under the manifest-error/substantial-credible-evidence standard of review. *K.D.F. & J.C.F. v. J.L.H.,* 933 So. 2d 971, 975 (Miss. 2006) (quoting *Vance v. Lincoln County Dep't of Pub. Welfare,* 582 So. 2d 414, 417 (Miss. 1991)). Therefore, we examine "whether credible proof exists to support the chancellor's finding of fact by clear and convincing evidence." *Id*. (citing *S.N.C. v. J.R.D.,* 755 So. 2d 1077, 1080 (Miss. 2000)). That being said, "[i]t is not this Court's role to substitute its judgment for the chancellor's." *Id.* (citing *Hensarling v. Hensarling,* 824 So. 2d 583, 587 (Miss. 2002)). Nonetheless, a chancellor

21

must make detailed findings of fact and conclusions of law when dealing with a termination of parental rights or adoption hearing.

¶46. The Pendletons requested that the chancellor terminate Tony's parental rights under Mississippi Code Section 93-15-103 and award them custody. Although the Pendletons were requesting custody of the minor child, the chancellor analyzed this case pursuant to Section 93-15-103. Section 93-15-103, dealing with termination of parental rights in connection with an adoption provides, in relevant part, that:

> When a child had been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or *the parent is unable or unwilling to care for the child*, relatives are not appropriate or are unavailable, *and* when adoption is in the best interests of the child, taking into account whether the adoption is needed to secure a stable placement for the child and the strength of the child's bonds to his natural parents and the effect of future contacts between them, the grounds listed in subsections (2) and (3) of this section shall be considered as grounds for the termination of parental rights. The grounds may apply singly or in combination in any given case.

Miss. Code Ann. § 93-15-103(1) (Rev. 2004) (emphasis added). As noted in the trial court's judgment, subsection (1) of the statute provides certain criteria which must be met prior to a consideration of the grounds for termination, one of which is, "the parent [must be] unable or unwilling to care for the child." *See Id.* This statute governs abandonment and/or desertion in connection with adoption, and deals with the present conduct of the natural parents. Tony's actions upon Deanna's death show that he is willing to care for Zachary. He immediately expressed an interest in forging a relationship with his son, began regularly visiting Zachary, and paying child support. Therefore, I agree with the majority that the chancellor did not commit manifest error in refusing to terminate Tony's parental rights.

¶47. However, abandonment and desertion also are looked at in a custody dispute and must be viewed in connection with Mississippi's custody statute. The custody statute, Section 93-5-24, provides that:

> (1) Custody shall be awarded as follows according to the *best interests* of the child . . . . (e) Upon a finding by the court that both parents of the child have *abandoned or deserted* such child or that both such parents are mentally, morally or *otherwise unfit* to rear and train the child the court may award physical and legal custody to: (i) The person whose home the child has been living in a wholesome and stable environment; or (ii) Physical and legal custody to any other person deemed by the court to be suitable and able to provide adequate and proper care and guidance for the child.

Miss. Code Ann. § 93-5-24(1)(e)(i)-(ii) (Rev. 2004) (emphasis added).

¶48. While this Court previously has looked at abandonment and desertion through the lens of a termination and adoption proceeding, the analysis and definitions are still applicable in a custody dispute. Abandonment and desertion have been defined separately, with each involving different factors but reaching the same conclusion. ***Ainsworth v. Natural Father***, 414 So. 2d 417, 419 (Miss. 1982). This Court noted that "abandonment has to do with the relinquishment of a right or claim, whereas desertion involves an avoidance of a duty or obligation." ***Id***. Abandonment is "any conduct on the part of the parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child." ***Id***.

¶49. The test for abandonment is "an objective one: whether under the totality of circumstances . . . the natural parent has manifested [his] severance of all ties with the child." ***J.R.D., Jr.***, 755 So. 2d 1077 (quoting ***Ethredge v. Yawn***, 605 So. 2d 761, 764 (Miss. 1992)). In defining the term "desertion," this court in ***Ainsworth*** noted the following definitions: "2. To forsake (a person, institution, cause, etc., having a moral or legal claims upon one). 3. To forsake one's duty, one's post or one's party." ***Ainsworth***, 414 So. 2d at 420.

23

¶50.    In my view the chancellor did not make adequate findings on the record regarding whether the conduct of James Leverock constituted abandonment or desertion in connection with Section 93-5-24 of the Mississippi Code. The chancellor clearly focused on the father's rights to raise his son, rather than on the child's best interests, when he ruled:

> While the short term security and interests of Zachary may be best served by leaving his custody in Plaintiffs, as cited in their post trial brief, the Supreme Court of Mississippi has " . . . never allowed termination of parental rights solely on grounds that others may be better parents." ***V.M.S., a Minor***, 938 So. 2d 829 (Miss. 2006). That same test must be used to measure Defendant's legal rights to raise his son as opposed to third parties not related by blood. *It is not the best interest of Zachary to be determined but rather the question presented is whether Defendant is fit and suitable to have custody of his son.*

(Emphasis added.)

¶51.    If Tony abandoned or deserted this child in connection with Mississippi Code Section 93-5-24, it follows that this nullifies any natural-parent presumption that would exist otherwise.[4] The record does indicate the chancellor looked at the petition for divorce and support agreement between the natural parents in order to make a determination on abandonment or desertion, but this is not enough. It is merely a document which James Leverock signed, it does not address his long absence from his son, Zachary. It is imperative that the court consider past behavior as well as the present, and the record does not include any indication that the chancellor addressed the nearly two-and-one-half-year absence by James Leverock from the life of his son.

¶52.    Therefore, it is my opinion that this case should be remanded to the trial court for a hearing on-the-record detailing and further addressing the nearly two-and-one-half-year

---

[4] This Court has long held that the natural-parent presumption means that the parents "have a natural right to the nurture, care and custody of their children. ***Simpson v. Rast***, 258 So. 2d 233, 236 (Miss. 1972).

24

period of absence by Tony from Zachary. If the court does find abandonment and/or desertion as set out by the custody statute found in Section 93-5-24, a best-interests analysis must be conducted on the record utilizing the *Albright*[5] factors, keeping in mind the polestar consideration is the best interests of the child. ***In re Custody of M.A.G.***, 859 So. 2d 1001, 1003 (Miss. 2003) (ruling that once unfitness is shown, the court must engage in a best-interests analysis utilizing the *Albright* factors); *see* ***K.D.F. v. J.L.H.***, 933 So. 2d 971, 981 (Miss. 2006).

**CARLSON, P.J., JOINS THIS OPINION. WALLER, C.J., JOINS THIS OPINION IN PART.**

---

[5]The *Albright* factors, used to determine child custody based on the best interests of the child, include: 1) age, health and sex of the child; 2) determination of the parent who had the continuity of care prior to the separation; 3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; 4) the employment of the parent and responsibilities of that employment; 5) physical and mental health and age of the parents; 6) emotional ties of parent and child; 7) moral fitness of parents; 8) the home, school and community record of the child; 9) the preference of the child at the age sufficient to express a preference by law; 10) stability of home environment and employment of each parent; and 11) other factors relevant to the parent-child relationship. *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).