MAXWELL, J.,
 

 for the Court:
 

 ¶ 1. This case involves a child-custody dispute between Aaron and Jennifer Love. The chancellor granted the couple an irreconcilable-differences divorce and determined their young son’s best interest would be served by awarding custody to Jennifer. Aaron appeals, arguing the chancellor misapplied several
 
 Albright
 
 factors and improperly discredited Aaron’s evidence of Jennifer’s substance abuse and endangerment of their son. Aaron also challenges the chancellor’s refusal to admit, in a limited post-trial hearing, photographs Aaron chose not to offer at the custody hearing.
 

 ¶ 2. Based on our deferential standard of review, we find no reversible error on the chancellor’s part and affirm her custody determination.
 

 FACTS AND PROCEEDINGS
 

 I. Background
 

 ¶ 3. Aaron and Jennifer lived together for several years. After discovering Jennifer was pregnant, they married. Jennifer gave birth to their son Tommy, and shortly afterward, the young family moved in with Aaron’s parents to save on expenses. They both worked, Jennifer as a bartender/waitress and Aaron as a salesman/store manager. After a year of living with her in-laws, Jennifer felt as if Aaron had no desire to leave his parents’ house. She also became frustrated that Aaron was not saving money so he could continue his education. Aaron had also become displeased with Jennifer’s lifestyle. She was staying out late after work and coming home either already drunk or going straight to their bedroom to drink.
 

 ¶ 4. In the fall of 2007, Jennifer moved out. She filed for divorce in January 2008. Aaron and Jennifer agreed to a temporary custody order entered December 2008. The temporary order provided that Jennifer would take care of Tommy Monday through Thursday, and Aaron would care for Tommy Thursday through Monday. Aaron worked mainly during the day. His mother kept Tommy while Aaron was at work. When Jennifer worked at night, she hired babysitters for Tommy. One babysitter, Felicia Jeffries, eventually moved in with Jennifer. But after several months Felicia moved out, leaving a dispute over unpaid rent and bills.
 

 ¶ 5. Both Jennifer and Aaron started new relationships before their divorce was final. Jennifer testified at the custody hearing that she was pregnant with her boyfriend’s baby and had no immediate plans to remarry. Aaron initially testified he was not in a sexual relationship. But later at a post-trial hearing, he admitted he had lied to the chancellor and, at the time of the custody hearing, his girlfriend was pregnant with his child.
 

 II. Custody Hearing
 

 ¶ 6. The permanent custody of Tommy was the only contested issue in the divorce. At the August 25, 2009 custody hearing, Jennifer testified about her relationship with Tommy and her parenting skills. Jennifer summarized her and Tommy’s daily routine and her efforts to provide struc
 
 *931
 
 ture and discipline. Jennifer also testified she took Tommy to church and was potty-training him so he could go to preschool. She recounted her responsibilities in other areas — how she had worked since she was fourteen, helped raise six younger siblings, and maintained her own household. Jennifer’s former co-worker and friend, Tonda Ellis, also testified favorably about Jennifer’s abilities as a mom.
 

 ¶ 7. Aaron responded by calling Jennifer’s former roommate, Felicia, who painted a much more negative picture of Jennifer. Felicia testified Jennifer often drank too much, smoked in the house, locked Tommy in his room so she did not have to watch him, and kept marijuana in the house. Aaron’s mother, Patricia Love, testified that, when Jennifer lived with them, she would often come home drunk. Patricia also recalled an occasion after Jennifer had moved out, when Jennifer picked up Tommy while intoxicated. On another occasion, she saw Jennifer smoking a cigarette with Tommy in the car.
 

 ¶ 8. The chancellor excluded several photographs taken by a private investigator that Aaron hired. Aaron and the investigator went inside Jennifer’s home while Jennifer and Tommy were out of town. The pictures depicted liquor and drug paraphernalia in Jennifer’s kitchen and a pistol under Jennifer’s mattress. The chancellor questioned Aaron’s authority to enter Jennifer’s house. But the chancellor acknowledged the exclusionary rule, which prevents the introduction in criminal trials of evidence illegally seized, does not apply to civil trials. Instead, the chancellor excluded the photographs as unreliable. Because the photographs were taken surreptitiously when Jennifer was out of town, the chancellor reasoned there was no way to determine whether Aaron had planted these items.
 

 III. Custody Determination
 

 ¶ 9. The chancellor analyzed the testimony using the
 
 Albright
 
 factors.
 
 See Albright v. Albright,
 
 437 So.2d 1003, 1005 (Miss.1983) (listing factors chancellors must consider when evaluating child custody). She found the following factors favored neither parent: (1) age, sex, and health of the child; (2) continuity of care; (3) willingness and capacity to provide primary care; and (4) physical and mental health and age of the parents.
 

 ¶ 10. The chancellor found three factors favored Aaron: (1) moral fitness of the parents; (2) home, school, and community record of the child; and (3) stability of the home environment and employment of each parent. The chancellor based her moral-fitness determination on Jennifer’s pregnancy with another man she did not intend to marry (not knowing Aaron was in a similar situation with his girlfriend). The chancellor’s findings on the other two factors hinged on the fact Aaron had extended family in the area and had remained in his parents’ home, where he and Jennifer had previously reared Tommy. The chancellor also noted that Aaron had changed jobs less frequently.
 

 ¶ 11. The chancellor determined three factors favored Jennifer: (1) best parenting skills, (2) the employment of the pai’-ents and responsibilities of that employment, and (3) emotional ties of parent and child.
 

 ¶ 12. The majority of the chancellor’s written order discussed Jennifer’s parenting skills. The chancellor addressed Patricia’s testimony about Jennifer being intoxicated when she picked up Tommy from Patricia’s house and smoking with Tommy in the car and found some of Patricia’s testimony not to be credible. She also discounted the reliability of Felicia’s testimony about Jennifer’s getting drunk, smoking pot, and sleeping around because
 
 *932
 
 Felicia was angry at Jennifer over how their living situation ended.
 

 ¶ 13. The chancellor found Aaron’s case centered more on Jennifer’s shortcomings than his own parenting skills. The chancellor noted: “Perhaps this is because when with Aaron, Tommy is, in effect, being raised by Aaron’s parents.” Citing Jennifer’s concern with Tommy’s daily routine, discipline, and health-insurance coverage, the chancellor found the parenting-skills factor “slightly” favored Jennifer.
 

 ¶ 14. Though the factors came out evenly, the chancellor determined it was in Tommy’s best interest that Jennifer be awarded custody and Aaron be given liberal visitation.
 

 IV. Motion to Reconsider and Post-trial Hearing
 

 ¶ 15. After the final decree, Aaron filed a motion to reconsider. He argued the chancellor misapplied
 
 Albright
 
 and erroneously excluded the investigator’s photographs. The chancellor granted a hearing to reconsider the admission of the photographs but not the
 
 Albright
 
 analysis. Based on the testimony of the investigator, the chancellor ultimately admitted the photographs. Both Aaron and Jennifer presented additional evidence about whether the pictures accurately depicted Jennifer’s lifestyle at home. During Jennifer’s testimony, Aaron sought to impeach her with other photographs taken from her camera. The chancellor refused to admit these photographs, a decision Aaron appeals as an abuse of discretion.
 

 ¶ 16. During Aaron’s testimony, he admitted he lied at the custody hearing about his girlfriend’s pregnancy and that she was indeed pregnant with his child. Weighing the new evidence, the chancellor found no reason to alter the award of custody to Jennifer.
 

 STANDARD OF REVIEW
 

 ¶ 17. “Determining custody of children is one of the most difficult decisions that courts must make.”
 
 Brewer v. Brewer,
 
 919 So.2d 135, 141 (¶ 21) (Miss.Ct.App.2005). “The law affords no mathematical formula for deciding such cases, and, even when the trial judge sensitively assesses the factors noted in
 
 [Albright]
 
 and progeny, the best the judiciary can offer is a good guess.”
 
 Buchanan v. Buchanan,
 
 587 So.2d 892, 897 (Miss.1991).
 

 ¶ 18. “Our standard of review in child custody cases is very narrow.”
 
 Montgomery v. Montgomery,
 
 20 So.3d 39, 42 (¶ 9) (Miss.Ct.App.2009) (citing
 
 Hensarling v. Hensarling,
 
 824 So.2d 583, 587 (¶ 8) (Miss.2002)). We may only reverse a child-custody determination if the chancellor is manifestly wrong, clearly erred, or applied an erroneous legal standard.
 
 Id.
 
 Our polestar consideration, like the chancellor’s, must be the best interest of the child.
 
 Id.
 
 But precedent dictates that we not substitute our judgment for that of the chancellor’s.
 
 Id.
 

 DISCUSSION
 

 I.
 
 Albright
 
 Analysis
 

 ¶ 19. Aaron seeks reversal of the custody decision, alleging the chancellor misapplied the law and misinterpreted the facts when she (1) awarded Jennifer two
 
 Al-bright
 
 factors — parenting skills and emotional ties of the parent and child; (2) failed to award Aaron two factors — age, sex, and health of the child and continuity of care; and (3) determined it was in Tommy’s best interest that Jennifer have custody.
 

 ¶ 20. Ultimately, Aaron asks us to find fault with the chancellor’s credibility determinations and evaluation of the weight of the evidence. He argues there
 
 *933
 
 was simply too much evidence of Jennifer’s bad behavior and bad parenting for her to be awarded custody. Our review shows the chancellor confronted all of Aaron’s evidence. And having the benefit of personally assessing Aaron and Jennifer’s credibility as well as other witnesses, she narrowly concluded Tommy’s best interest favored custody with Jennifer. Because we find the chancellor supported her conclusion with substantial evidence, we refrain from substituting our own judgment for hers. Though this case is perhaps as close as it gets, we find no manifest error in the chancellor’s decision.
 

 A. Parenting Skills
 

 ¶21. The chancellor devoted the majority of the discussion in her order to parenting skills. After a detailed description of her factual findings, she found this factor “slightly favors the mother.” She based her decision on Jennifer’s evidence of her parenting abilities. The chancellor noted that, instead of promoting his own parenting skills, Aaron focused mainly on Jennifer’s shortcomings. The chancellor surmised this might have been because Aaron relied on his parents to raise Tommy. While finding neither to be a perfect parent, the chancellor found Aaron’s evidence about Jennifer’s mistakes — much of which the chancellor did not find credible — was outweighed by Jennifer’s care and concern for Tommy.
 

 ¶ 22. Aaron’s challenge on this factor hones on the chancellor’s credibility determinations. He argues the chancellor manifestly erred in believing Jennifer’s explanations over his. He directs us to four witnesses that gave intertwined and corroborated versions of Jennifer’s inattention and endangerment of Tommy. But our hands are largely tied in assessing witness credibility from an appellate record. Indeed, our supreme court instructs that credibility determinations are not generally the province of appellate courts. “The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts.”
 
 Johnson v. Gray,
 
 859 So.2d 1006, 1014 (¶ 36) (Miss.2003) (citing
 
 Chamblee v. Chamblee,
 
 637 So.2d 850, 860 (Miss.1994)). It is not the role of this court to substitute our judgment for the chancellor’s.
 
 Montgomery,
 
 20 So.3d at 42 (¶ 9). Rather, our task is to decide whether her judgment is supported by substantial evidence.
 
 Id.
 
 Jennifer responded to Patricia’s and Aaron’s testimony, which included describing how Jennifer had fallen asleep while Tommy was in a high chair, kept a gun under the mattress, and left beer bottles within Tommy’s reach. And the chancellor found Jennifer’s explanation more credible. While concerned with some of Jennifer’s actions — such as keeping a latch on Tommy’s door — the chancellor was also impressed with Jennifer’s acceptance of responsibility for herself and her child and her adaption of her work-life to accommodate her son. The chancellor also found it important that Jennifer had established her own household, while Tommy continued to live with his parents. Based on this evidence, we cannot find the chancellor manifestly erred in deciding this factor favored Jennifer and ultimately determining it was in Tommy’s best interest that Jennifer have custody.
 

 B. Emotional Ties of the Parent and Child
 

 ¶ 23. Aaron disagrees that this factor favored Jennifer. He argues the chancellor improperly gave more weight to Jennifer’s ties to Tommy than Tommy’s ties to each of his parents. The chancellor did recognize that, while there was no indication “Tommy loves either of his parents more than the other,” Jennifer testi
 
 *934
 
 fied about “how devastated she would be without Tommy.” The chancellor also found Jennifer breast fed Tommy, took Tommy with her when she moved out of Aaron’s parents home, and demonstrated “how interwoven their lives and schedules have become.” We find substantial evidence supports this conclusion.
 

 C. Age, Sex, and Health of the Child
 

 ¶ 24. Aaron argues the chancellor made two legal errors in deciding Jennifer’s smoking while pregnant and in front of Tommy did not weigh against Jennifer on this factor. First, he argues the chancellor misappropriated a divorce defense to child custody. In her bench ruling, the chancellor reasoned, because Aaron knew Jennifer was a smoker before he had a child with her and married her, he should not be able to “benefit” from her smoking on this factor.
 
 See
 
 Deborah H. Bell, Mississippi Family Law § 4.03(1) (2005) (discussing “knowledge of condition” as a potential defense to grounds for divorce). Second, he argues the chancellor, in her original analysis of this factor, improperly focused on Jennifer’s present condition as an ex-smoker, citing
 
 Jerome v. Stroud,
 
 689 So.2d 755, 757 (Miss.1997).
 

 ¶ 25. We agree with Aaron that one spouse’s knowledge of the other’s habits at the time of marriage, while possibly relevant in a fault-based divorce proceeding, has no place in best-interest-of-the-child analysis. But this was not the chancellor’s reason for finding this factor did not weigh against Jennifer. Contrary to Aaron’s assertion, the chancellor did consider Jennifer’s past as a smoker. In the custody order, the chancellor noted Jennifer had smoked in the past and secondhand smoke contributed to Tommy’s multiple ear infections. But the chancellor believed Jennifer when she maintained she had quit smoking. Thus, from our review, it appears in assessing credibility, the chancellor discredited the contradictory testimony that Jennifer continued smoking even after hearing from Tommy’s doctor that second-hand smoke’s contributed to Tommy’s ear problems. The chancellor weighed both Jennifer’s past and present conduct and determined this factor should favor neither parent. We find substantial evidence supports this conclusion.
 

 ¶ 26. Aaron also argues the chancellor failed to consider evidence that Jennifer mis-administered Tommy’s prescription medication on two separate occasions. Jennifer testified the mistakes stemmed from her misunderstanding of instructions she received second-hand from Aaron and Patricia. That such miscommunication could occur between estranged parents is understandable. We find no manifest error in the chancellor not weighing these incidents against Jennifer on this factor.
 

 D. Continuity of Care
 

 ¶27. The chancellor found this factor favored neither parent. She based this decision on the temporary order that gave each parent equal time with Tommy. Aaron argues the chancellor failed to acknowledge the order gave him more time—four days to Jennifer’s three. However, we do not find Aaron’s additional day with Tommy necessitated the chancellor find Aaron provided a greater continuity of care. The chancellor’s interpretation of the temporary order—that it gave both parents shared custody, not Aaron custody and Jennifer visitation—was supported by substantial evidence. Both parents testified they agreed to share custody until the chancellor could make a final determination. And the record supports finding Jennifer’s care of Tommy, while not exactly equivalent in time, was as significant as Aaron’s.
 

 ¶ 28. Aaron also argues he provided greater continuity of care because,
 
 *935
 
 when he worked, only his mother babysat Tommy, while Jennifer had utilized four different babysitters since the separation.
 
 [1]
 
 But Jennifer testified that, since the separation, she tried not to work as much during the week when she had Tommy. She also had begun sewing from her house so she could stay home with Tommy. The chancellor found Jennifer was very involved in Tommy’s routine and discipline on the days she had Tommy. We find substantial evidence supports the determination this factor favored neither parent.
 

 E. Reconsideration
 

 ¶ 29. Much of the chancellor’s rationale for favoring Aaron on the moral-fitness factor was based on Jennifer’s testimony she had become pregnant with her boyfriend, whom she did not intend to marry. The chancellor also favorably considered Aaron’s initial testimony that he was not in a sexual relationship, which he later admitted was false at a post-trial hearing. Had Aaron not initially concealed that he too was expecting a child from another woman, it is quite likely neither parent would have been favored.
 

 ¶ 30. While not changing any specific
 
 Albright
 
 findings at the reconsideration hearing, the chancellor did weigh Aaron’s previous perjured testimony along with his additional photographic evidence of Jennifer’s drinking, proximity to drug use, and keeping a gun within Tommy’s reach. But after considering this evidence at the post-trial hearing, the chancellor found custody should not be altered. We find no error in this decision.
 

 II. Exclusion of Additional Photographs
 

 ¶ 31. Aaron also requests that we find reversible error in the chancellor’s exclusion of photographs taken by an investigator hired by Aaron. The chancellor granted a post-trial hearing to reconsider this evidentiary exclusion. After hearing testimony from the investigator, the chancellor admitted the photographs. The chancellor also allowed additional testimony from both parties about whether Jennifer indeed drank, did drugs, and had a loaded gun in her home. But the chancellor excluded additional photographs taken from Jennifer’s camera showing Jennifer taking shots of liquor and her brother apparently smoking pot in her house, which Aaron sought to introduce to impeach Jennifer.
 

 ¶ 32. The admission of evidence is within the discretion of the chancellor.
 
 Sproles v. Sproles,
 
 782 So.2d 742, 749 (¶ 29) (Miss.2001). We will not reverse unless that discretion is abused.
 
 Id.
 
 Though Aaron argues the chancellor excluded the photographs as a discovery sanction without first applying the four-factor test from
 
 Mississippi Power & Light Co. v. Lumpkin,
 
 725 So.2d 721, 733-34 (¶ 60) (Miss.1998), we find the chancellor was not bound by that test at the post-trial hearing.
 

 ¶ 33. Minutes before seeking to introduce the additional photographs, Aaron objected to one of Jennifer’s friends testifying. His basis for doing so was because Jennifer neither listed her as a witness for the initial custody hearing nor supplemented her witness list to include this witness before the post-trial hearing. The chancellor sustained the objection and did not allow the friend to testify. When Jennifer similarly objected to the new photographs, the chancellor likewise sustained her objection because Aaron’s counsel ac
 
 *936
 
 knowledged he had these photographs during the trial but neither disclosed them in pretrial discovery nor supplemented discovery before the post-trial hearing. We certainly find no abuse of discretion in the chancellor holding both parties to the same standard.
 

 ¶ 34. The chancellor expressly limited her reconsideration to the admission and reliability of the investigator’s photographs. While the investigator, Aaron, and Jennifer were permitted to testify, the chancellor sustained objections by both parties to evidence that could have been offered at the custody hearing but was not. We find no reversible error in this decision.
 
 Sproles,
 
 782 So.2d at 749 (¶ 29) (refusing to reverse chancellor on evidence-admissions error “unless it affirmatively appears from the entire record that the judgment has resulted in a miscarriage of justice”) (citing
 
 Ill. Cent. R.R. v. Williams,
 
 242 Miss. 586, 606, 135 So.2d 831, 839 (1961)).
 

 CONCLUSION
 

 ¶ 35. This court has previously acknowledged, “[w]e may not always agree with a chancellor’s decision as to whether the best interest[] of a child have been met, especially when we must review that decision by reading volumes of documents rather than through personal interaction with the parties before us.”
 
 Brewer,
 
 919 So.2d at 140 (¶ 17) (citing
 
 Hensarling,
 
 824 So.2d at 586-87 (¶ 8)). “However, in custody cases, we are bound by the limits of our standard of review and may reverse only when the decision of the trial court was manifestly wrong, clearly erroneous, or an erroneous legal standard was employed.”
 
 Id.
 
 (citing
 
 Wright v. Stanley,
 
 700 So.2d 274, 280 (Miss.1997)).
 

 ¶ 36. The cold record, Aaron argues, is fraught with examples of Jennifer’s alleged misconduct and neglect. But the chancellor had an important hands-on benefit that we lack — her personal assessments of Jennifer’s and Aaron’s credibility — both at the custody hearing and post-trial hearing. Based on these interactions, the chancellor discounted some of the negative testimony about Jennifer, accepted much of it, and evaluated all of the testimony against the evidence of Jennifer’s care for Tommy. The chancellor ultimately found Jennifer had slightly better parenting skills and that it was in Tommy’s best interest that Jennifer be awarded custody and Aaron liberal visitation. Admittedly, this is a close case. But because the chancellor supported her decision with substantial evidence, we find our deferential standard requires us to affirm.
 

 ¶ 37. THE JUDGMENT OF THE WASHINGTON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS AND RUSSELL, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT. MYERS AND CARLTON, JJ., NOT PARTICIPATING.
 

 [1]
 

 . Like the chancellor, we question Aaron’s emphasis on the care his mother provided to argue
 
 he
 
 provided greater continuity of care than Jennifer.