# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00969-COA

**IN THE MATTER OF THE ADOPTION OF THE MINOR CHILD DESCRIBED IN THE PETITION: J.A.G. AND WIFE, S.G.**       **APPELLANTS**

**v.**

**C.T. AND B.T.**       **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/06/2016 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | OLIVER E. DIAZ JR. |
| | DAVID NEIL MCCARTY |
| ATTORNEY FOR APPELLEES: | GAIL D. NICHOLSON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 11/14/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., BARNES AND WESTBROOKS, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1. This case stems from a contested adoption suit filed in Hancock County Chancery Court between maternal grandparents, J.A.G.[1] and S.G. ("grandparents"), and foster parents, B.T. and C.T. ("foster parents"). The parental rights of G.L.'s natural parents were terminated by judgment of the Hancock County Chancery Court following an order from Hancock County Youth Court recommending termination and a finding that the minor child's best interest would be served by adoption. Subsequently, the grandparents filed a complaint

---

[1] To protect the minor child's confidentiality, we will refer to her and the parties throughout this opinion by their initials.

for adoption, and the foster parents filed a motion for leave to intervene and an intervenor's petition for adoption of G.L. On June 21, 2016, the chancery court granted the foster parents' petition to adopt G.L. The grandparents appeal. After our review of the record, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. G.L., a minor female child, was born to T.G. (mother) and A.H. (father) on June 21, 2012. T.G. and A.H. were living in a FEMA trailer with A.H.'s mother, M.H. (paternal grandmother), in Picayune, Mississippi.

¶3. G.L. was removed from this home and placed in a foster home from January 14, 2013, through February 5, 2013, after T.G., A.H., and M.H. were found unconscious from ingesting or taking oxycodone, leaving G.L. alone in the home without supervision. Later in February 2013, G.L. was temporarily placed with her grandparents. G.L. stayed with her grandparents for a while, because no one else in the grandparents' family could take care of G.L.

¶4. The foster parents presented testimony that J.A.G. approached B.T. at work regarding taking care of G.L. The grandparents of G.L. and the foster parents were close friends, and the grandparents conceded that they were glad that someone they knew could become foster parents for G.L. In July 2013, G.L. began spending the night with B.T. and C.T. The grandparents testified that during this time, the foster parents expressed interest in becoming G.L.'s foster parents. However, according to the grandparents, permanent reunification of G.L. with her mother was always the plan.

¶5.     B.T. and C.T. filed a Resource Family Application and completed the steps required by the Department of Human Services ("DHS") to become licensed foster parents. J.A.G. and S.G. testified that they did not become licensed foster parents, because they felt it would be an incentive for their daughter to overcome her drug addiction.

¶6.     Dana Spiers, who was a family-protection specialist employed with DHS in 2013, testified that S.G. stated that she and her husband were not interested in becoming licensed foster parents, because they had raised other children and did not want to raise any more. She also testified that S.G. stated that her older daughter, living in Louisiana, decided she could not handle raising G.L. Further, Spiers testified that S.G. stated that she knew someone from the community that would adopt G.L., because she could not take care of G.L. on a long-term basis.

¶7.     Tequila Hall, another family-protection specialist for Hancock County DHS in 2013, testified that S.G. told her that she and her husband were not interested in becoming licensed foster parents, because they found family friends willing to adopt G.L. However, S.G. denied she made these statements, and denied that she did not want to keep G.L. long-term.

¶8.     Subsequently, G.L. permanently moved in with her foster parents in October 2013. During that time, the grandparents continued to visit G.L. Also during that time, G.L.'s mother, T.G., moved back in with the grandparents, and visitation with G.L. became more difficult. However, T.G. began using drugs again and eventually reentered a rehabilitation center.

¶9. In August 2014, the grandparents filed a petition for adoption in the Chancery Court of Pearl River County. They asserted that they obtained a lawyer and filed a petition for adoption of G.L. once they realized that T.G. would not comply with the orders from DHS to reunite with G.L. However, their petition was denied for lack of proper venue.[2] C.T. and J.A.G. testified that they had engaged in a heated exchange after she confronted S.G. regarding their petition for the adoption of G.L. The grandparents testified that their relationship with the foster parents became strained after the confrontation, and they had to obtain an attorney to set visitation schedules.

¶10. In November 2014, the grandparents filed a petition for custody, termination of parental rights, and adoption of G.L. in the Chancery Court of Hancock County. In December 2014, the foster parents filed a motion for leave to intervene and an intervenor's petition for adoption. Their amended petition for the adoption of G.L. was filed in July 2015.

¶11. T.G. and A.H.'s parental rights were terminated, and Ralph Lee Price III ("Price") was appointed as guardian ad litem ("GAL"). The grandparents and foster parents presented evidence, and the chancellor heard the testimony from Price regarding his recommendations for the adoption of G.L. First, Price recommended that the foster parents' petition for adoption of G.L. be approved. Second, Price recommended that the grandparents and foster parents create a visitation schedule, so that the grandparents could remain in G.L.'s life.

---

[2] The grandparents and the foster parents live in Pearl River County; however, venue was proper in the Hancock County Chancery Court.

Price based his recommendation on his extensive review and investigation of G.L.'s file, which included interviews of both parties and visits to both residences.

¶12. Using the *Albright*[3] factors, the totality of the circumstances, and considering the best interest of G.L., the chancellor granted the foster parents' petition to adopt G.L. The chancellor also strongly recommended that the foster parents allow the grandparents to visit G.L., even though the court was without authority to require the foster parents to permit visitation.

¶13. The grandparents contend that the chancellor erred in granting the foster parents' petition for adoption and challenge the chancellor's analysis and application of certain *Albright* factors. Accordingly, we will only address the factors and issues the grandparents brought before this Court.

## STANDARD OF REVIEW

¶14. "In a case disputing child custody, the chancellor's findings will not be reversed unless manifestly wrong or clearly erroneous, or the proper legal standard was not applied." *In re N.B.*, 135 So. 3d 220, 223 (¶9) (Miss. Ct. App. 2014) (quoting *Mabus v. Mabus*, 847 So. 2d 815, 818 (¶8) (Miss. 2003)). Furthermore, "[the appellate court] will affirm the decree if the record shows any ground upon which the decision may be justified." *Id*. (citation and quotation marks omitted).

## DISCUSSION

---

[3] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

## I. Whether the chancellor erred in the "emotional ties" analysis.

¶15. The chancellor completed an extensive analysis of the *Albright* factors to determine the best interest of G.L. In determining the best interest of the child, the following factors should be considered:

> Age, health, and sex of the child; a determination of the party that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of each party and responsibilities of that employment; physical and mental health and age of the parties; emotional ties with the child; moral fitness of parties; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each party[;] and other relevant factors.

*In re N.B.*, 135 So. 3d at 224 (¶12) (quoting *Albright*, 437 So. 2d at 1005).

¶16. The grandparents assert that the chancellor did not honor their emotional ties with G.L. The grandparents further assert that the chancellor did not mention the "power of their familial bond." We disagree. The following is an excerpt from the chancellor's final judgment: "While this Court recognizes the [grandparents'] biological family ties with [G.L.] and is cognizant that kinship may be a factor for consideration, there is no rule preferring a third party based on the degree of kinship."

¶17. We are of the opinion that the chancellor adequately addressed the grandparents' relationship as G.L.'s biological maternal grandparents. We note that the grandparents' kinship to G.L. does not require that they are given a preference for custodial or adoption purposes. The grandparents are the maternal grandparents of G.L.—not her biological

6

parents. This Court has previously held that "we are aware of no hard and fast rule that gives preference in a custody dispute such as this to any particular litigant based solely on the degree of kinship." *Loomis v. Bugg*, 872 So. 2d 694, 698 (¶17) (Miss. Ct. App. 2004). Therefore, this issue is without merit.

¶18. During oral argument, the grandparents asserted that they had constitutional rights as blood relatives in an adoption matter and cited *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494 (1977). However, they did not present this argument in their brief before this Court, and so we cannot make this determination regarding the constitutional rights of grandparents in this adoption matter even though parental rights have been terminated. This issue is not properly before this Court.

## II. Whether the chancellor erred in the "parenting skills" analysis.

¶19. The grandparents assert that they were punished by the chancellor, because they worried that their long-term care of G.L. would disrupt their daughter's recovery from drug abuse. As a result, they argue that the "parenting skills" analysis of the *Albright* factors was incorrectly weighed against them. We disagree.

¶20. The chancellor discussed the grandparents' decision declining to become G.L.'s foster parents. They asserted that they made the decision because they thought it would be a disincentive to their daughter's rehabilitation. However, we find nothing in the record to reflect that the chancellor abused his discretion by discussing their support of their daughter.

¶21. The grandparents testified that their daughter would come to stay with them after her

7

stints in rehabilitation centers.  We note that the chancellor found the grandparents' daughter an issue of particular concern.  The chancellor was concerned that the biological mother could remain an integral part of G.L.'s life if they were awarded custody.

¶22.    In *In re N.B.*, 135 So. 3d at 226 (¶25), this Court held: "[W]e do not find that the chancellor erred in considering the relationship the parties had with their children, current or prospective, when reconsidering their parenting skills."  *In re N.B.* stemmed from a contested adoption suit filed in Prentiss County Chancery Court between paternal grandparents and paternal great-grandparents on behalf of biological minor twins.  *Id*. at 221-22 (¶1).

¶23.    Accordingly, we find this issue to be without merit.

### III.    Whether the *Albright* factors negatively portrayed the grandparents.

¶24.    The grandparents assert that the chancellor portrayed their family in a negative light while analyzing four of the other *Albright* factors: "the physical and mental health and age of the parents," "age, health, and sex of the child," "employment of the parents," and "stability of the home."

### A.    The Physical and Mental Health and Age of the Parties

¶25.    The grandparents contend that the chancellor erred in not finding that their physical and mental health and age should have been weighed equally with that of the foster parents. They maintain that no evidence was presented that their age incapacitated them from being parents.

¶26. In support of their assertion, the grandparents reference that there was no evidence presented for the chancellor to weigh this factor in favor of the foster parents. In fact, the chancellor noted that all parties were in good physical and mental shape. The chancellor also noted that C.T. was thirty-four years old, and B.T. was thirty-eight years old at the time, and that they were nonsmokers. The foster parents also passed their medical evaluation by the Mississippi Department of Health prior to G.L.'s placement in their home.

¶27. Further, the chancellor discussed that J.A.G. was forty-nine years of age, and S.G. was forty-eight years of age at the time. There was evidence presented that they were both smokers; however, they avoided smoking in their homes and automobiles. Although the chancellor stated that the foster parents' younger ages made them more compatible with raising a young child, he concluded that the factor weighed in favor of the foster parents, because they were nonsmokers. At trial, testimony was presented that G.L. suffers from asthma and uses an inhaler regularly.

¶28. The grandparents assert that there was no evidence presented that G.L. had ever had an asthma attack as a result of their smoking. However, the chancellor's discussion of G.L.'s asthma and the smoking habits of the grandparents is not an abuse of discretion. Moreover, this Court has upheld a chancellor's findings where smoking was considered in an *Albright*-factor analysis. *See Davis v. Stephens*, 85 So. 3d 943, 950 (¶31) (Miss. Ct. App. 2012); *Love v. Love*, 74 So. 3d 928, 934 (¶25) (Miss. Ct. App. 2011).

¶29. Therefore, we find no abuse of discretion. We agree with the chancellor's analysis

9

of this factor. Furthermore, this Court has previously held that "the chancellor has the ultimate discretion to weigh the evidence the way she sees fit in determining where the child's best interest lies." *In re N.B.,*135 So. 3d at 227 (¶33).

### B.    Age, Health, and Sex of the Child

¶30.    The grandparents contend that the chancellor erred in finding that the age, health, and sex of G.L. weighed in favor of the foster parents. In support of their argument, the grandparents argue that nothing in the record described how they could not provide for a child G.L.'s age, and that the facts indicate they had been her only parents for the better part of a year when she was very little.

¶31.    Evidence at trial revealed that G.L. was three years of age at the time. She was generally in good health; however, she occasionally struggled with asthma and used an inhaler. The chancellor noted that the foster parents have two young sons, ages eleven and seven, who reside at the home where G.L. has lived for the majority of her life. The foster parents testified that their sons were honor-roll students who were involved in sports and weekly events at church. Additionally, the foster parents testified that they take their sons to weekly practices. G.L. takes gymnastics and ballet classes, which involve weekly rehearsals. The grandparents' youngest child was nineteen years of age at the time of trial. There was no evidence to suggest that the grandparents were busy with activities with their youngest child. Therefore, the chancellor found that the foster parents led a lifestyle conducive to successful parenting of younger children and concluded that the adoptive

parents' lives were centered around rearing children.

¶32.   Accordingly, we find there is credible evidence to support the chancellor's decision, and this issue is meritless.

### C.     Employment of the Parents

¶33.   The grandparents assert that the chancellor incorrectly discounted an actual advantage that should have been awarded to them.  They argue that the fact that S.G. was a homemaker should have weighed in their favor, because she could have given full-time care to G.L.

¶34.   In the chancellor's analysis, he stated that S.G. did not work outside the home, and also acknowledged that J.A.G. was a senior electrician, working approximately forty hours a week (Monday through Thursday).  The chancellor also noted that B.T. had been employed for the past eight years at Air Products & Chemicals, and C.T. had managed the same dental office for over thirteen years, working Monday through Thursday.  However, the chancellor determined that while S.G. could provide more daily care, G.L. was in preschool and was adequately provided for while the foster parents were at work.

¶35.   We find no abuse of discretion with the chancellor's findings or analysis of this factor.

### D.     Stability of the Home

¶36.   Further, the chancellor noted that G.L., the foster parents, and their two sons lived in a newly built, five-bedroom, three-bath home.  G.L. has her own room and toys.  The foster parents testified that they have a support system consisting of several family members to help care for G.L., and that G.L. was familiar with these members of their family.  Therefore, the

chancellor found that the foster parents had extensive family to assist in rearing G.L., whereas the grandparents presented no evidence of additional family support. As a result, the chancellor found this factor slightly weighed in favor of the foster parents.

¶37. Accordingly, we find no abuse of discretion with the chancellor's analysis of the factor. Furthermore, this Court has held:

> An *Albright* analysis is not premised solely on a scoring system to determine which parent "wins," and our review for manifest error is not a mechanical check on the chancellor's score card to see if she "tallied" each parent's score correctly. Instead, we ask whether the chancellor considered all relevant facts, giving deference to the weight she assigns each factor.

*In re N.B.,* 135 So. 3d at 227 (¶30) (quoting *May v. May*, 107 So. 3d 1052, 1054 (¶8) (Miss. Ct. App. 2013)).

¶38. Additionally, the chancellor noted that there was no evidence presented that any of the parties suffered from immoral character or exhibited any immoral behavior, nor was there any evidence that the parties had been involved in any illegal activity. The chancellor stated that both families attended church regularly and enjoyed long marriages. So the argument the grandparents submit to this Court asserting that the chancellor's application of the factors showed their family in a negative light is meritless.

¶39. Finally, during oral argument, the grandparents conceded that the chancellor's analysis of the *Albright* factors did not amount to manifest error. They also conceded that the chancellor's analysis of the *Albright* factors was thorough, even though they did not agree with the chancellor's analysis of the factors.

12

¶40. Accordingly, after review of the record, the chancellor's written findings and judgment, and oral argument, we find that the chancellor did not abuse his discretion in his analysis of the *Albright* factors. The chancellor made clear findings of fact and conclusions of law for each factor after weighing the evidence, including the GAL's report.

¶41. **AFFIRMED**.

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON AND GREENLEE, JJ., CONCUR. TINDELL, J., NOT PARTICIPATING.**